UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**SONGWRITERS OF NORTH AMERICA,**
**for itself and on behalf of its members**
11849 Hartsook Street
Valley Village, CA  91607,

**MICHELLE LEWIS**
11849 Hartsook Street
Valley Village, CA  91607,

**THOMAS KELLY**
128 Hampstead Court,
Thousand Oaks, CA  91361, and

**PAMELA SHEYNE**
11109 Dona Pegita Drive
Studio City, CA  91604,

        *Plaintiffs*;

        vs.

**UNITED STATES DEPARTMENT**
**OF JUSTICE, LORETTA E. LYNCH, in**
**her official capacity as United States**
**Attorney General, and RENATA B.**
**HESSE, in her official capacity as Acting**
**Assistant Attorney General, Antitrust**
**Division,**
950 Pennsylvania Ave., NW
Washington, D.C. 20530,

        *Defendants*.

Civil Case No. _____

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Songwriters of North America ("SONA"), Michelle Lewis, Thomas Kelly, and Pamela Sheyne allege as follows:

### THE NATURE OF THE CASE

1.      Music enriches all aspects of our lives: we eat, drink, drive and exercise to music; we get married to music; and we are comforted by music when we lose the ones we love.  Those who create the music we live by need to earn a living from the music they create.  Sadly, however, it has become increasingly difficult for songwriters and composers to make a living in the internet age.  While in theory, the rise of online music services should hold great promise, in reality, many songwriters and composers have seen a sharp decline in their income, and find it difficult to making a living at their craft.  In part this is due to pervasive government regulation of the music marketplace, which leaves songwriters and composers with little control over the licensing of their works or the rates at which they are paid.  The songwriter and composer plaintiffs who have filed this lawsuit have done so in the hope that this Court will rectify a particularly egregious and unjust manifestation of government interference with their creative output and livelihoods, as described below.

2.      In this action, plaintiffs challenge a sweeping pronouncement by the Department of Justice Antitrust Division ("Antitrust"), rendered without proper authority or due process of law, that will limit and undermine the creative and economic activities of every songwriter and composer in the United States, as well as songwriters and composers abroad.

3.      In order to authorize their works to be streamed, broadcast or otherwise played for the public, songwriters and composers typically join a performing rights organization ("PRO") early in their career so that the PRO can issue licenses and collect royalties on their behalf.  The two largest PROs in the United States are ASCAP and BMI, which together represent approximately 90% of the market; two smaller entities, SESAC and GMR, make up the rest.

4.      ASCAP and BMI—but neither SESAC nor GMR—have been subject to federal antitrust consent decrees, entered into with the United States in 1941, that set forth agreed terms

governing certain of their collective licensing practices.  Individual songwriters and composers—including plaintiffs here—are not party to these decrees.

5.      In 2014, ASCAP and BMI requested Antitrust, which oversees the government's role in relation to the decrees, to consider modifying the 75-year-old decrees to allow for more flexible licensing practices in the digital age.

6.      Following a two-year review, rather than granting the requests, on August 4, 2016, Antitrust issued a determination (the "August 4 determination") announcing an extraordinary new rule.  Under this rule—and contrary to the longstanding practice of the music industry—songwriters and composers who have collaborated together to write a song will no longer be allowed to license only their proportionate share of that work through the PRO of their choice. Instead, under the Antitrust mandate, ASCAP and BMI are now required to provide "full-work" (or "100%") licenses for all of the songs they represent, even when the PRO in question does not represent all of the co-writers of the song—or face an antitrust enforcement action (the "100% Mandate").

7.      In a dramatic departure from the status quo, the new rule mandates that songs that cannot be licensed by either ASCAP or BMI on a 100% basis due to contractual restrictions—or for any other reason—will no longer be eligible to be included in that PRO's repertory.

8.      As a result of the 100% Mandate, songwriter and composer affiliates of ASCAP or BMI who lack the authority to grant rights to their co-writers' shares—or who wish to continue their longstanding arrangements with co-writers to license only their own shares—will lose the privilege of licensing their co-authored works through ASCAP or BMI.  This includes foreign writers who rely upon ASCAP or BMI to represent their works for licensing in the United States and are legally unable to grant rights to a co-author's share.

9.      Because PRO licensing is the only practical means for most songwriters and composers to collect royalties for the public performance of their songs by streaming services, on radio, and by the myriad other entities that play their music, Antitrust's action amounts to a draconian penalty inflicted on songwriters and composers merely for exercising the rights they are granted under the Copyright Act.

10.    Moreover, the effects of the 100% Mandate will not be felt by members of ASCAP and BMI alone.  Antitrust's ruling will also impact the activities of songwriters and composers who have chosen *not* to affiliate with ASCAP or BMI, and have instead joined a different PRO not governed by the consent decrees, for example, SESAC or GMR.  This is because under the 100% Mandate, the shares belonging to non-ASCAP and BMI writers for songs written in collaboration with ASCAP or BMI writers will now also be subject to licensing by ASCAP and BMI.

11.    The 100% Mandate abrogates songwriters' and composers' rights under U.S. copyright law to separately control the licensing and administration of their copyright interests. The Copyright Act expressly permits authors to divide, and separately own and exploit, the works they create with others.

12.    Although Antitrust seeks to portray the 100% Mandate as a "confirmation" of existing practice under the consent decrees, this is a fiction.  In actuality, the PROs—as well as the music industry in general—have long administered and collected royalties for only the shares of songs they represent, a practice referred to as "fractional" licensing.  Indeed, in the August 4 determination, Antitrust contradicted its own purported rationale by allowing ASCAP and BMI one year to "transition to" and "comply[] with" the 100% Mandate if they wish to avoid an enforcement action.

13.    Remarkably, as part of the August 4 determination, Antitrust advises songwriters and composers who do not wish to have a PRO with which they are not affiliated administer their copyright interests, or whose works are no longer eligible for licensing by ASCAP or BMI under the new rule, that they should proceed to reconsider and alter their creative and economic relationships.  According to Antitrust, for example, co-authors may designate a single writer of a co-owned song to collect and distribute royalties for the song, or undertake to amend their contracts with co-writers governing the administration of co-authored songs to accommodate the new order.

14.     Similarly, in responding to one songwriter's concerns about the impact of the 100% licensing on the songwriting community, a representative of Antitrust suggested that songwriters could simply resign from ASCAP.

15.     In essence, the August 4 determination directs every songwriter in the nation to undertake the burdensome and potentially costly process of revisiting and amending their core business practices, private contracts, and collaborative relationships—that is, to reorder their economic and creative lives—in order to accommodate the 100% Mandate.  Antitrust's casual disregard for the welfare and livelihoods of America's songwriters and composers cannot be overstated.

16.     Antitrust's 100% Mandate will have a profound and lasting detrimental impact on music creators.  As openly acknowledged by Antitrust, under the new rule, songwriters and composers will, among other things:

- Be deprived of the ability to choose the PRO that will license their shares of co-authored works;

- Be required to withdraw works from representation by ASCAP or BMI;

- Have songs that they must license outside of the PRO system;

- Need to cede administrative control over their copyrights, including the right to collect royalties, to unaffiliated third parties;

- Be compelled to renegotiate existing contractual relationships on a song-by-song basis;

- Be forced to consider whether they should decline to collaborate with creators who are not members of the same PRO; and

- Have reason to consider withdrawing from ASCAP or BMI altogether.

17.     Such regulation of individual creators' business practices and copyright interests—here, under the pretense of "confirming" the terms of 75-year-old decrees that never in fact required this and to which individual writers are not parties—is extraordinary and unprecedented, and an abuse of agency power.  In furtherance of its ultra vires objective, Antitrust cast aside the repeated and strenuous objections of songwriters, composers and others

concerning the widespread disruption and harm the rule would entail, as well as an exhaustive opinion by the U.S. Copyright Office—in response to an inquiry by Congress—explaining why such a mandate would undermine creators' rights under the Copyright Act.

18.     Antitrust's sua sponte adoption of a rule abrogating significant economic and intellectual property rights of songwriters and composers far exceeds any conceivable authority conferred upon Antitrust or any federal agency.  The 100% Mandate is an illegitimate assertion of agency power in gross violation of plaintiffs' due process rights, copyright interests, and freedom of contract, and needs to be set aside.

## THE PARTIES

19.     Plaintiff Songwriters of North America ("SONA") is a grassroots songwriter advocacy organization.  SONA, a domestic nonprofit corporation incorporated in California, with its principal (and only) office in Los Angeles, brings this action for itself and on behalf of its individual songwriter and composer members.  SONA's roster of over 200 professional songwriter and composer members represent a broad range of musical genres and include Grammy, Emmy, and Academy Award-winning creators.  SONA members license and collect public performance royalties through PROs, including ASCAP and BMI, as well as SESAC and GMR.

20.     Plaintiff Michelle Lewis, the Executive Director of SONA, is a professional songwriter and composer who resides in Los Angeles, California.  Lewis has written songs for such notable artists as Cher, Hillary Duff, Katherine McPhee, and others, and is the co-writer of the original music used on the popular children's television show Doc McStuffins.  Lewis, a longtime member of ASCAP, has co-authored songs with many songwriters who are not ASCAP members.

21.     Plaintiff Thomas Kelly is a professional songwriter and musician who resides in Thousand Oaks, California.  Kelly is best known for his songwriting partnership with Billy Steinberg, a member of ASCAP.  Kelly and Steinberg have written numerous hit songs, including five number one singles in the 1980s.  Examples of Kelly's work include "True Colors," recorded by Cyndi Lauper and Phil Collins; "I'll Stand by You," recorded by The Pretenders, "I

Touch Myself," recorded by Divinyls, "Like a Virgin," recorded by Madonna, and "So Emotional," recorded by Whitney Houston.  Kelly was inducted into the Songwriters Hall of Fame in 2011.  He is currently affiliated with GMR.

22.     Plaintiff Pamela Sheyne, a member of SONA, is a professional songwriter and composer who resides in Studio City, California.  Sheyne is probably best known for co-writing Christina Aguilera's Grammy Award-winning single "Genie in a Bottle," and has also written songs for Dream, Jessica Simpson, the Backstreet Boys and other artists, as well as soundtracks to films such as *Pokemon: The Movie*, *The Princess Diaries*, and *Sonny With a Chance.*  Until recently, Sheyne was affiliated with BMI.  As described in more detail below, despite Sheyne's considerable success as a songwriter, her plan to move to SESAC has been undermined by the fact that she has co-written songs with ASCAP and BMI writers who are subject to the 100% Mandate.

23.     Defendant United States Department of Justice is a federal executive agency, headquartered in Washington, D.C., that includes an Antitrust Division.

24.     Defendant Loretta E. Lynch is the Attorney General of the United States and head of the Department of Justice.  She is sued in her official capacity only.

25.     Defendant Renata B. Hesse is an Acting Assistant Attorney General in the Department of Justice and head of the Antitrust Division.  She is sued in her official capacity only.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action involves federal questions, and under 5 U.S.C. § 702 because this action challenges a federal agency action.  The court has authority to grant relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because defendants are located in the district and many of the actions at issue occurred in this district.

# BACKGROUND

**Relevant Copyright Principles and Industry Practice**

28.      Songwriters and composers who create musical works enjoy a copyright interest in those works, which, among other exclusive rights, includes the right to authorize others to publicly perform those works.  Because there are millions of songs, on the one hand, and countless entities that seek the ability to play music, on the other—ranging from bars and restaurants to radio and television to internet streaming services—copyright owners, as well as music users, rely on the PROs, including ASCAP, BMI, SESAC and GMR, to issue and administer licenses for the performance of musical works in the United States.  The PROs typically issue "blanket" licenses that grant licensees the right to perform all of the copyright interests that the PRO represents.

29.      The PROs compete with one another for members, in part by offering different membership terms and methodologies for the distribution of royalties.  The distinctions among PROs are important to songwriters and composers, who choose their affiliation based on their perception of which organization will bring the most benefit.   An individual songwriter or composer can only belong to one PRO.

30.      When a songwriter or composer creates a song, he or she may assign his or her copyright interest in that song to a music publisher, who will assist in marketing and licensing the work in exchange for a portion of the income derived from the work.  Music publishers, too, affiliate with PROs in order to collect their share of performance royalties.

31.      Songwriters and composers often collaborate in creating musical works.  Indeed, the majority of popular songs on the charts today are created by multiple writers.  Under U.S. copyright law, when two or more creators intend for their respective contributions to be merged into a single work, that work is considered a "joint" work.  Assuming they do not make a different arrangement—as discussed below—each joint author enjoys an equal share of the work, and any one of the co-authors may grant a nonexclusive license to use the work in its entirety, provided that the licensing author accounts to his or her co-author for the co-author's share of royalties (the "joint author rule").

32.     Notwithstanding the joint author rule, the Copyright Act expressly recognizes copyright owners' ability to divide and/or reapportion their rights and interests in particular works, including musical works.  This important principle of copyright law allows authors to override the joint author rule if they so choose.  It is thus critical to understand that the joint author rule allowing a co-author to grant a license for the work as a whole can be, and frequently is, altered by agreement between the co-authors.  This is especially common in the music industry, where, in the case of jointly authored works, the overwhelming practice is for each co-owner to administer and grant licenses only for their respective share of a work—otherwise known as "fractional" licensing.

33.     In keeping with the music industry norm of fractional licensing, the copyright interest assigned by a songwriter or composer to be administered by his or her publisher is thus limited to the songwriter or composer's share of the work.  Likewise, what the publisher transfers to the writer's PRO is also limited to that writer's share.  In addition, in many cases, co-writers enter into formal co-administration agreements that expressly prohibit writers from licensing each other's interests.

34.     Also significant is the fact that the joint author rule does not apply when a songwriter "samples" an earlier copyrighted song (*i.e.*, takes a portion of the earlier work and includes it in a new work)—a practice that is particularly common in the popular and urban genres.  In such a case, the newer work may not constitute a joint work (since there was no intent by the writers to collaborate), so the author of the earlier song would not be subject to the joint author rule.  Rather, both the original author and the author of the new work retain an independent, separately licensable copyright interest in his or her respective contribution to the new song.

35.     Finally, while the joint author rule may apply under U.S. law, it is not the law of foreign jurisdictions, where typically a co-author may license only his or her own share of a work.  Notably, ASCAP and BMI represent many foreign works for licensing in the United States, the fractional shares of which do not provide a basis for 100% licensing.

36.     In sum, the joint author rule that is at the heart of Antitrust's 100% Mandate does not in fact apply to many songs.  Setting aside the herculean effort that would be required to identify those songs in the vast catalogs of the PROs that may be licensed on a 100% basis versus those that may not, it is clear that many songs would not qualify and would be ineligible for licensing by either entity.

**Antitrust's Review and Issuance of the 100% Mandate**

37.      Since 1941, both ASCAP and BMI have been operating under consent decrees that were entered into to resolve antitrust claims asserted by the government some 75 years ago. ASCAP's decree was last amended in 2001, and BMI's in 1994.  The decrees, which constitute final judgments, are essentially contracts between the United States, on the one hand, and ASCAP or BMI, on the other, and bind only those parties.

38.     Both ASCAP and BMI grant public performance licenses to a wide range of users, the majority of which are negotiated between the licensee and the relevant PRO.  On information and belief, royalty rates and terms negotiated by licensees vary as between ASCAP and BMI. Under the decrees, if the parties cannot agree on license terms, they can turn to a federal judge to set a rate.  Because two different judges set the rates for ASCAP and BMI, judicially determined rates may vary as well.

39.     In 2014, ASCAP and BMI requested Antitrust—the government unit responsible for the United States' interest in relation to the consent decrees—to consider potential modifications of the decrees to allow, among other things, PRO members to withdraw certain digital licensing rights so that they could individually engage in direct licensing of digital music services.  Antitrust responded by commencing a review and soliciting written comments from industry stakeholders.

40.     In 2015, Antitrust expanded its pending review to consider whether the consent decrees required licensing on a 100% basis, and solicited additional written comments on that question.  The songwriting community was extremely concerned that this issue had somehow become a subject of inquiry, since, as explained above, fractional licensing has long been the norm in the music industry, including the PROs.

41.     Numerous representatives of music creators, including SONA, submitted written comments to Antitrust unequivocally opposing any such measure.  SONA pointed to the "direct, immediate, and lasting harm" that would result from such a change:  "In one single stroke, the [Antitrust] Division's interpretation will upend the right of hundreds of thousands of songwriters to choose to continue to creatively collaborate with colleagues irrespective of their PRO affiliation and to choose how we wish our work to be licensed …. [O]ur ability to be paid by a trusted source, to ensure that we are not charged by two separate PROs for the same service, and, most important, to continue to earn a living will be severely compromised."

42.     In January 2016, Representative Doug Collins of the U.S. House of Representatives requested the views of the U.S. Copyright Office concerning the fractional licensing issue.  The Copyright Office responded with a meticulous analysis setting forth the host of legal and policy concerns presented by a 100% licensing rule, "Views of the United States Copyright Office Concerning PRO Licensing of Jointly Owned Works," available at *http://www.copyright.gov/policy/policy-reports.html*.  The Copyright Office analysis concluded that the imposition of a 100% licensing rule would seemingly "vitiate important principles of copyright law, interfere with creative collaborations among songwriters, negate private contracts, and impermissibly expand the reach of the consent decrees."

43.     On information and belief, throughout its two-year review, Antitrust conducted ex parte meetings and telephone discussions with interested parties.  As far as plaintiffs are aware, there are no public records of these discussions—even as to who was there or the general topics of discussion.

44.     SONA, along with other songwriter groups, participated in several meetings with Antitrust.  During these discussions, songwriters and composers continued to reiterate their strong objection to the imposition of any sort of 100% licensing regime.

45.     SONA—which was not accompanied by counsel in their interactions with Antitrust—experienced the review process as without clear process, lacking in transparency, and confusing.  For example, in one meeting, they understood Antitrust to be saying they would *not*

be imposing 100% licensing—only to learn in a subsequent discussion that this was not in fact the case.

46. SONA eventually became convinced that their participation in the process would not alter the outcome of the review, and that their input was merely to assist Antitrust in crafting its 100% rule. When plaintiff Lewis asked a representative of Antitrust how they expected songwriters to cope under the new rule, the response was that she and her fellow songwriters could simply "leave ASCAP."

47. In or about late June 2016, Antitrust contacted SONA to schedule SONA members' attendance (by telephone) at meetings to take place shortly after the July 4th holiday, during which Antitrust would be presenting a near-to-final version of its determination. Antitrust again generated confusion on SONA's part by asserting that songwriters would be "happy" with the outcome it would be announcing. Unfortunately, as it turned out, this was far from the truth.

48. To prepare for the upcoming meetings, SONA requested a copy of Antitrust's pending determination, but the response from Antitrust was that written copies would not be made available, either in advance of or at the meeting. Instead, Antitrust explained, it would read the document aloud to the assembled group—a procedure SONA perceived as bizarre for such an important ruling from a government entity. Although this was the first time the new rule would be shared with the songwriter groups, Antitrust warned that no substantive comments would be entertained. The songwriter groups would have one week to submit a letter in which they could identify technical concerns with what had been read at the meeting, if any—but the substance of the rule was final.

49. SONA members attended the two meetings held by Antitrust with songwriter groups in early July, during which Antitrust adhered to its procedure of reading aloud its final determination incorporating the 100% Mandate, including its requirements for compliance and instructions for songwriters. SONA was deeply disappointed with the ruling that was presented at these meetings, but understood—per Antitrust's direction—that the decision was final, and any further objections or substantive comments would be futile.

50.     On August 4, 2016, Antitrust issued its final determination implementing the 100% Mandate in written form.  This was the first time plaintiffs were permitted to review the rule in writing and begin to more fully assess the many ways it would undermine their copyrights, contractual obligations, PRO affiliations, and co-writer relationships.

51.     Although the August 4 determination presents the 100% Mandate as simply a "confirmation" and "recognition" of existing licensing practices of the PROs, this is false and misleading.  To begin with, as explained above, ASCAP and BMI in fact represent, license, and collect royalties only for the fractional shares of works they represent.  This is underscored by the fact that ASCAP and BMI, and their respective members, do not currently account for or pay royalties to each other for co-owned works—as would be required if they were actually licensing works on a 100% basis.

52.     Nor is it plausible that licensees are obtaining two 100% licenses from ASCAP and BMI—each subject to its own rates and terms—for the very same work, as Antitrust claims. The reality is that users are taking and paying for ASCAP and BMI licenses according to each PRO's "ownership-weighted market share" (to employ Antitrust's terminology)—that is, the aggregate market share of all of the full and fractional interests each PRO actually represents.

53.     Moreover, the August 4 determination itself belies Antitrust's stance that 100% licensing is the status quo, because in that determination, Antitrust found it necessary to allow ASCAP and BMI a yearlong "period of adjustment" to "transition to" and "comply[] with" the 100% Mandate, during which period the two PROs are to "develop a shared understanding" of their practices with industry stakeholders.

54.     Equally revealing is Antitrust's acknowledgment that under the 100% Mandate, some works will become "unlicensable" by the PROs and need to be "remov[ed] from" the PROs' blanket licenses.  The August 4 determination thus directs ASCAP and BMI to "eliminate … uncertainty" about the works they will be able to license under the 100% Mandate, "including obtaining from songwriter and publisher members the assurances they need" to offer licenses on a 100% basis.

55.     It is clear, then, that despite the fig leaf of "confirming" existing licensing practices of the PROs, Antitrust understood that it was actually altering them in very material ways.  Indeed, recognizing the significant uncertainty and upheaval the 100% Mandate will cause, the August 4 determination recommends "certain practices" to permit "the continued use of licenses offered by ASCAP and BMI."

56.     Despite the fact that individual songwriters and composers are not parties to the consent decrees, many of Antitrust's recommended "practices" are aimed specifically at them.  For example, Antitrust advises that "if co-writers have a contract that prevents each co-owner from licensing the song on a full-work basis and those co-owners are members of different PROs, the co-owners may amend their contract either to revert to the default [joint author] rule or to choose a single PRO as the licensing agent for the song."  Antitrust elaborates by explaining that co-writers from ASCAP and BMI may, for example, choose to designate the ASCAP member to "collect all revenues from the licensing of public performance rights to the song and require that the ASCAP member distribute a share of the revenues to the BMI member."  Antitrust concludes that songwriters and composers whose songs may no longer be eligible for licensing through ASCAP or BMI as a result of the 100% Mandate "can use the next year to determine whether they want their songs available for licensing on a full-work basis by ASCAP and BMI and, if so, whether their songwriting arrangement will need to be modified to accommodate that goal."

**Harms Flowing from the 100% Mandate**

57.     Plaintiffs are being, and will continue to be, significantly harmed by the 100% Mandate.  The experience of plaintiff Sheyne is illustrative.  Sheyne was a long-time member of BMI until recently, when she determined it would be in her interest to leave BMI and join SESAC—in part because SESAC is not itself subject to the 100% Mandate.  By any standard, Sheyne is a highly successful songwriter, and, on information and belief, SESAC would like to sign her.  Although Sheyne provided notice of her resignation to BMI, she has not yet been able to join SESAC due to the fact that some of her most valuable songs are co-written by ASCAP and BMI writers, and are thus subject to 100% licensing.  Because SESAC may not be able to

collect for Sheyne's shares (which will be paid to ASCAP or BMI under the 100% rule), SESAC faces significant risk in providing Sheyne with what would otherwise be a typical advance against her future royalties for the performance of her works.  So not only is Sheyne without a PRO to license her performance rights at the moment, she has also been deprived of a critical income stream.

58.     In sum, the100% Mandate harms plaintiffs by, among other things:

- Diminishing the value of their copyrighted musical works;

- Abrogating the rights of songwriters and composers under copyright law to divide and separately administer the copyright interests in the works they create;

- Eliminating songwriters' and composers' ability to choose the PRO that will administer their public performance rights;

- Undermining the legal and practical ability of songwriters and composers to exploit their works in the marketplace;

- Negating songwriters' and composers' ability to be notified of, and to receive accountings and collect payment for, the use of their works;

- Interfering with and negating songwriters' and composers' existing and future contractual and business relationships marketplace;

- Impeding songwriters' and composers' ability to collaborate with other creators of music to create new works;

- Subjecting songwriters and composers to unlawful, arbitrary, and capricious government action; and

- Undermining songwriters' and composers' ability to make a living at their profession.

## FIRST CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF—
## DENIAL OF DUE PROCESS

### (U.S. Const. amend. V)

59.     Plaintiffs reallege and incorporate the previous paragraphs of the complaint as if fully set forth herein.

60.     Under the Fifth Amendment to the United States Constitution, no person is to be deprived of life, liberty or property without due process of law.

61.     The 100% Mandate is not a "confirmation" of any existing practice but a new, substantive rule that diminishes and encumbers the copyright interests and private contractual rights and relationships of songwriters and composers across the United States and abroad.

62.     In seeking to regulate the copyright interests and private economic choices of songwriters and composers, Antitrust has acted far beyond the permissible bounds of its agency authority, without procedural safeguards, and contrary to law and fact, thus violating plaintiffs' rights of procedural and substantive due process, and taking their property without compensation.

63.     An actual and substantial controversy exists between plaintiffs and defendants concerning their respective legal rights, duties, and relations.  A judicial declaration that the 100% Mandate violates the Fifth Amendment of the Constitution and is unenforceable is therefore necessary and appropriate to secure plaintiffs' rights under law.

## SECOND CLAIM FOR DECLARATORY INJUNCTIVE RELIEF—
## VIOLATION OF FEDERAL ADMINISTRATIVE LAW

### (Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.)

64.     Plaintiffs reallege and incorporate the previous paragraphs of the complaint as if fully set forth herein.

65.     Under the Administrative Procedure Act, federal agencies are precluded from promulgating rules or policies in excess of the agency's authority; that are arbitrary, capricious, an abuse of discretion or otherwise unlawful; that are adopted without appropriate procedural safeguards; or that are unsupported by relevant fact.

66.     Even if it had the authority to adopt the 100% Mandate—which it does not—that rule must still be set aside in light of the arbitrary, capricious and otherwise unlawful manner in which it was promulgated by Antitrust.

67.     Antitrust issued the new rule under the misleading premise that it was merely "confirm[ing]," rather than changing, the terms of the consent decrees.  Antitrust's characterization is belied by overwhelming evidence that the 100% rule represents a momentous change in existing PRO practices, as well as by Antitrust's own acknowledgment that it will require a year to implement and that songwriters and composers will be required to significantly alter their creative and business relationships to accommodate it.

68.     The 100% Mandate was summarily announced as a conclusive and final agency action—without prior publication or opportunity for substantive comment—following a series of ad hoc, ex parte discussions that are nowhere documented in the public record.

69.     Antitrust's precipitous adoption of a far-reaching rule that profoundly alters the legal rights and responsibilities of parties over whom Antitrust has no regulatory authority is the quintessence of unlawful agency action, and violates multiple principles of administrative law embodied in the Administrative Procedure Act.

70.     An actual and substantial controversy exists between plaintiffs and defendants concerning their respective legal rights, duties, and relations.  A judicial declaration that the 100% Mandate constitutes unlawful agency action in violation of the Administrative Procedure Act and is unenforceable is therefore necessary and appropriate to secure plaintiffs' rights under law.

## PRAYER FOR RELIEF

Wherefore, plaintiffs respectfully ask the Court to enter judgment:

    (a)  Declaring the 100% Mandate unconstitutional under the Fifth Amendment;

    (b)  Declaring the 100% Mandate unlawful under relevant provisions of the Administrative Procedure Act;

    (c)  Preliminarily and permanently enjoining defendants from enforcing the 100% Mandate; and

    (d)  Granting such other relief as the Court deems just and proper.


Respectfully Submitted,


DATED:       September 13, 2016          BY: */s/ Gerard P.  Fox*

                                             Gerard P. Fox (D.C. Bar No. 401744)
                                             gfox@gerardfoxlaw.com
                                           GERARD FOX LAW, P.C.
                                         1875 Connecticut Ave. NW, 10th Floor
                                         Washington, DC  20009
                                         310-441-0500

                                         *Attorneys for Plaintiffs*
                                         *Songwriters of North America,*
                                         *Michelle Lewis, Thomas Kelly,*
                                         *and Pamela Sheyne*


*Of Counsel*:
Jacqueline C. Charlesworth, Esq.
(Admitted in New York; pro hac vice motion forthcoming)
  jcharlesworth@earthlink.net
1520 York Ave. #9A
New York, NY  10028