UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| **SONGWRITERS OF NORTH AMERICA, et al.,** | Case No. 1:16-cv-01830 (TSC) |
| Plaintiffs, | **ORAL ARGUMENT REQUESTED** |
| vs. | |
| **UNITED STATES DEPARTMENT OF JUSTICE, et al.,** | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

  1.  The Plaintiffs ................................................................................................ 3

  2.  Copyright and Collaboration ...................................................................... 4

  3.  ASCAP, BMI, and the Consent Decrees .................................................. 6

  4.  The Justice Department's August 2016 Determination ............................. 7

  5.  Consequences of the August 2016 Determination .................................. 10

  6.  The Purpose of Copyright Law ................................................................ 11

ARGUMENT .......................................................................................................... 13

  I.  Plaintiffs have standing because they are now suffering and will imminently suffer injuries traceable to defendants' agency action. ......................... 13

    A.  Legal Standards for Rule 12(b)(1) ........................................... 13

    B.  The Court has jurisdiction over this action because plaintiffs meet the case-or-controversy requirement. ............................................. 14

      1.  Plaintiffs have established all the elements of standing. ............... 14

        a.  Plaintiffs have suffered injuries in fact. ........................... 15

        b.  Plaintiffs' injuries are traceable to defendants' conduct and redressable by the Court .............................................. 19

      2.  This action is ripe because plaintiffs are feeling the effects of the agency action in a concrete way. ....................................................... 20

    C.  This Court will not be interfering with the Southern District of New York. ............................................................................. 21

    D.  This Court has jurisdiction over plaintiffs' valid taking claim. ............... 22

  II.  The complaint states constitutional and APA claims. ......................... 24

    A.  Legal Standards for Rule 12(b)(6) ........................................... 24

    B.  Constitutional Violations ....................................................... 25

1. The complaint states a procedural-due-process claim because insufficient procedures concerning the agency action deprived plaintiffs of property and liberty.......................................................25

    a. Defendants deprived plaintiffs of property and liberty interests. ........................................................................ 26

    b. Defendants deprived plaintiffs of their rights without due process of law............................................................ 27

2. The complaint states a substantive-due-process claim because the agency action deprives plaintiffs of their speech, association, and contract freedoms. .........................................................29

C. APA Violations .......................................................................... 31

1. The August 2016 Determination is an agency action because it is a rule or the equivalent of a rule. ........................................31

2. The August 2016 Determination is a reviewable final agency action. ................................................................................ 33

    a. The Determination is final because it concluded the Justice Department's consent-decrees review, determining plaintiffs' rights and obligations and having legal consequences. ............................................... 33

    b. No adequate alternative remedy is available from the Southern District of New York. ........................................ 39

III. In the alternative, plaintiffs should be granted leave to amend the complaint. .... 40

IV. Plaintiffs request oral argument. ........................................................ 41

CONCLUSION ................................................................................ 41

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner,*
  387 U.S. 136 (1967) ............................................................................................ *passim*

Allen v. Wright,
  468 U.S. 737 (1984) ............................................................................................ 14

Am. Nat'l Ins. Co. v. FDIC,
  642 F.3d 1137 (D.C. Cir. 2011) ............................................................................ 14

Animal Legal Defense Fund, Inc. v. Glickman,
  154 F.3d 426 (D.C. Cir. 1998) ............................................................................. 14

*Appalachian Power Co. v. EPA,*
  208 F.3d 1015 (D.C. Cir. 2000) ...................................................................... 31, 37

Application of Stolar,
  401 U.S. 23 (1971) .............................................................................................. 18

Ass'n of Nat'l Advertisers v. FTC,
  627 F.2d 1151 (D.C. Cir.1979), *cert. denied,* 447 U.S. 921 (1980)........................................ 28

AT&T Co. v. EEOC,
  270 F.3d 973 (D.C. Cir. 2001) ...................................................................... 36, 37

Babbitt v. Youpee,
  519 U.S. 234 (1997) ............................................................................................ 23

*Barrick Goldstrike Mines Inc. v. Browner,*
  215 F.3d 45 (D.C. Cir. 2000) ............................................................................... 37

Batterton v. Marshall,
  648 F.2d 694 (D.C. Cir 1980) ............................................................................. 31

*Bennett v. Spear,
520 U.S. 154 (1997) ................................................................................................. passim

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,
239 U.S. 441 (1915) ............................................................................................ 28

Biton v. Palestinian Interim Self-Gov't Autk,
310 F. Supp. 2d 172 (D.D.C. 2004) .................................................................... 14

Bowen v. Massachusetts,
487 U.S. 879 (1988) ............................................................................................ 39

Bldg. Indus. Ass'n of Superior California v. Babbitt,
979 F. Supp. 893 (D.D.C. 1997) ........................................................................ 19

Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,
148 F.3d 1080 (D.C. Cir. 1998) .......................................................................... 14

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.,
452 F.3d 798 (D.C. Cir. 2006) .................................................................. 31, 37, 38

Chlorine Inst., Inc. v. Fed. R.R. Admin.,
718 F.3d 922 (D.C. Cir. 2013) ............................................................................ 21

*Ciba-Geigy Corp. v. EPA,
801 F.2d 430 (D.C. Cir. 1986) ............................................................................ 37

*Columbia Broad. Sys. v. U.S.
316 U.S. 407 (1942) ...................................................................................... 19, 20

Comm. on Oversight & Gov't Reform v. Holder,
979 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................ 14

Competitive Enter. Inst. v. Na'l Highway Traffic Safety Admin.,
901 F.2d 107 (D.C. Cir. 1990) ............................................................................ 19

*Corbello v. DeVito*,
  832 F. Supp. 2d 1231 (D. Nev. 2011) ...................................................................... 5

*\*Detroit Int'l Bridge Co. v. Gov't of Canada*,
  133 F. Supp. 3d 70 (D.D.C. 2015, *amended on denial of reconsideration*,
  No. CV 10-476 (RMC), 2016 WL 3030226 (D.D.C. May 26, 2016) ..................... 22-23, 23, 24

*Devia v. Nuclear Regulatory Comm'n*,
  492 F.3d 421 (D.C. Cir. 2007) ............................................................................ 21

*Dioguardi v. Durning*,
  139 F.2d 774 (2d Cir. 1944) ............................................................................... 25

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
  438 U.S. 59 (1978) ............................................................................................ 28

*\*E. Enterprises v. Apfel*,
  524 U.S. 498 (1998) .......................................................................................... 23

*EEOC v. St. Francis Xavier Parochial Sch.*,
  117 F.3d 621 (D.C. Cir. 1997) ........................................................................... 25

*\*Eldred v. Ashcroft*,
  537 U.S. 186 (2003) .......................................................................................... 12

*English v. D.C.*,
  815 F. Supp. 2d 254 (D.D.C. 2011), *aff'd*, 717 F.3d 968 (D.C. Cir. 2013)............. 25

*Forget v. Specialty Tools of Canada Inc.*,
  62 C.P.R. (3d) 537 (1995) (B.-C. C.A.) .............................................................. 10

*\*Frozen Food Express v. U.S.*,
  351 U.S. 40 (1956) ....................................................................................... 35, 36

*\*Gen. Elec. Co. v. Jackson*,
  610 F.3d 110 (D.C. Cir. 2010) ........................................................................... 27

*Goings v. Court Servs. & Offender Supervision Agency for D.C.*,
786 F. Supp. 2d 48 (D.D.C. 2011) ........................................................................... 27

*Golan v. Holder*,
132 S. Ct. 873 (2012) .............................................................................................. 18

*Goldstein v. California*,
412 U.S. 546 (1973) ................................................................................................ 12

*Gordon v. U.S. Capitol Police*,
778 F.3d 158 (D.C. Cir. 2015) ............................................................................... 25

*Griggs v. Pace Am. Group, Inc.*,
170 F.3d 877 (9th Cir. 1999) .................................................................................. 40

*Harris v. Sec'y, U.S. Dep't of Veterans Affairs*,
126 F.3d 339 (D.C. Cir. 1997) ............................................................................... 40

*Heller v. D.C.*,
670 F.3d 1244 (D.C. Cir. 2011) ............................................................................. 29

*Hodel v. Irving*,
481 U.S. 704 (1987) ................................................................................................ 23

*Hunt v. Wash. State Apple Advers. Comm'n*,
432 U.S. 333 (1977) .......................................................................................... 18, 19

*Hutchins v. D.C.*,
188 F.3d 531 (D.C. Cir. 1999) ............................................................................... 29

*\*Idaho Power Co. v. FERC*,
312 F.3d 454 (D.C. Cir. 2002), *as amended on reh'g* (Mar. 5, 2003) .............. 15, 16

*Indep. Equip. Dealers Ass'n v. EPA*,
372 F.3d 420 (D.C. Cir. 2004) ............................................................................... 32

*Jerome Stevens Pharms., Inc. v. FDA*,
   402 F.3d 1249 (D.C. Cir. 2005) ........................................................................ 14

*\*Kaiser Aetna v. U.S.*,
   444 U.S. 164 (1979) ...................................................................................... 26

*Kentucky Dep't of Corr. v. Thompson*,
   490 U.S. 454 (1989) ...................................................................................... 26

*Kowal v. MCI Commc'ns Corp.*,
   16 F.3d 1271 (D.C. Cir. 1994) ................................................................... 24, 25

*\*Londoner v. City and County of Denver*,
   210 U.S. 373 (1908) ...................................................................................... 27

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................... 20

*Martin-Trigona v. U.S.*,
   779 F.2d 72 (D.C. Cir. 1985) ......................................................................... 21

*\*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ...................................................................................... 28

*Mazer v. Stein*,
   347 U.S. 201 (1954) ................................................................................. 12, 26

*Milk Indus. Found. v. Glickman*,
   949 F. Supp. 882 (D.D.C. 1996) ................................................................... 31

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
   795 F.3d 997 (9th Cir. 2015) ......................................................................... 26

*Monroe v. Williams*,
   705 F. Supp. 621 (D.D.C. 1988) ................................................................... 40

*N.Y. Times Co. v. U.S.*,
  403 U.S. 713 (1971) ................................................................................................ 29

*NAACP v. Meese*,
  615 F. Supp. 200 (D.C. 1985) ................................................................................. 38

*Nat. Res. Def. Council, Inc. v. U.S.E.P.A.*,
  859 F.2d 156 (D.C. Cir. 1988) ................................................................................ 28

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
  538 U.S. 803 (2003) ........................................................................................... 20, 21

*Nat'l Wildlife Fed'n v. Babbitt*,
  835 F. Supp. 654 (D.D.C. 1993) ............................................................................. 31

*Police Dep't of Chicago v. Mosley*,
  408 U.S. 92 (1972) ................................................................................................... 30

*Preseault v. ICC*,
  494 U.S. 1 (1990) .................................................................................................... 23

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) .............................................................................. 15

*\*Reno v. Flores*,
  507 U.S. 292 (1993) ................................................................................................ 29

*Richardson v. U.S.*,
  193 F.3d 545 (D.C. Cir. 1999) ................................................................................ 14

*\*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ........................................................................................... 17, 18

*S. Power Co. v. N. Carolina Pub. Serv. Co.*,
  263 U.S. 508 (1924) ..................................................................................... 16, 29, 30

*Scenic Am., Inc. v. U.S. Dep't of Transportation*,
  983 F. Supp. 2d 170 (D.D.C. 2013) ....................................................... 39

*Schuler v. U.S.*,
  617 F.2d 605 (D.C. Cir. 1979) ............................................................... 24

*Sparrow v. United Air Lines, Inc.*,
  216 F.3d 1111 (D.C. Cir. 2000) ............................................................. 24

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .............................................................................. 19

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir.1996). .............................................................. 40

*Tele-Communications of Key West, Inc. v. U.S.*,
  757 F.2d 1130 (D.C. Cir. 1985) ............................................................. 30

*Texas v. U.S.*,
  523 U.S. 296 (1998) .............................................................................. 21

*Thomas v. Principi*,
  394 F.3d 970 (D.C. Cir. 2005) ............................................................... 14

*Thompson v. Washington*,
  497 F.2d 626 (D.C. Cir. 1973) ............................................................... 28

*\*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) .......................................................... 22, 24

*U.S. Army Corps of Engineers v. Hawkes Co., Inc.*,
  136 S. Ct. 1807 (2016) (*Hawkes*) ................................................. *passim*

*U.S. v. Broad. Music Inc.*,
  1:64-cv-03787 (SDNY). .......................................................................... 27

*United Distrib. Cos. v. FERC*,
  88 F.3d 1105 (D.C. Cir. 1996) ................................................................ 15

*Vitek v. Jones*,
  445 U.S. 480 (1980) .................................................................... 25, 27

*W. Coast Hotel Co. v. Parrish*,
  300 U.S. 379 (1937) ........................................................................ 30

*Weinberger v. Wiesenfeld*,
  420 U.S. 636 (1975) ........................................................................ 30

*Woodruff v. DiMario*,
  197 F.R.D. 191 (D.D.C. 2000) ............................................................ 25

**Statutes**

5 U.S.C. § 551 ................................................................................ 31

5 U.S.C. § 551(4) ...................................................................... 31, 32

5 U.S.C. § 551(13) ........................................................................ 31

5 U.S.C. § 701(a)(2) ...................................................................... 31

5 U.S.C. § 702 ................................................................................ 33

5 U.S.C. § 704 ........................................................................ 33, 39

17 U.S.C. § 101 ................................................................................ 4

17 U.S.C. § 106 ........................................................................ 4, 26

17 U.S.C. § 201(d)(2) .................................................................. 5, 10

Fed. R. Civ. P. 12(b)(1) ........................................................ 13, 14, 24

Fed. R. Civ. P.  12(b)(6) ...................................................... 13, 24, 25

Fed. R. Civ. P. 15(a)(2) .................................................................. 40

Fed. R. Civ. P. 24(b)(1) .................................................................. 39

Fed. R. Civ. P. 24(b)(1)(A) ..................................................................................... 39

Fed. R. Civ. P. 24(b)(1)(B) ..................................................................................... 40

U.S. Const. Art. I, §8, CL.8 ................................................................................... 11

**Regulations**

60 Fed. Reg. 42569 ................................................................................................... 7

**Other Authorities**

1 Paul Goldstein, *Goldstein on Copyright* § 4.2 n.5 ...................................................... 5

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.03 (rev. ed. 2015) ............. 12

1 Melville B. Nimmer & David Nimmer*, Nimmer on Copyright* § 1.03[A] (rev. ed. 2015)........ 12

2 William F. Patry, *Patry on Copyright* § 5.9 (2014) ................................................... 5

Chris Castle, *The Obama Administration Is Lame Ducking an Unworkable Burden on Songwriters: 4 Reasons Why It's Bad Law*, The Huffington Post (July 12, 2016) http://www.huffingtonpost.com/chris-castle/the-obama-administration-_ 6_b_10903474.html................................................................................................. 13

Ed Christman, *"Disappointing": Publishing Industry Expresses Confusion, Concern, Over Sweeping Dept. of Justice Decision*, Billboard, (July 5, 2016), http://www.billboard.com/articles/business/7424128/publishing-industry-ascap-bmi-sony-atv-umpg-confusion-concern-blanket-licenses-100-percent ...................................................... 17, 30

Ed Christman, *The Dept. of Justice Said to Be Considering a Baffling New Rule Change for Song Licensing*, Billboard, (July 30, 2016) http://www.billboard.com/ articles/business/6649208/the-dept-of-justice-said-to-be-considering-a-baffling-new-rule-change-for.............................................................................................................. 9

Matthew J. Cursio, *Born to Be Used in the USA: An Alternative Avenue for Evaluating Politicians' Unauthorized Use of Original Musical Performances on the Campaign Trail*, 18 Vill. Sports & Ent. L.J. 317 (2011) ...................................................................... 5

Jane C. Ginsburg, *The Concept of Authorship in Comparative Copyright Law*, 52 DePaul L. Rev. 1063, 1064 (2003) ................................................................................................ 12

Brittany Hodak, *U.S. Dept. Of Justice Deals Crushing Blow To Songwriters*, Forbes, (July 1, 2016), http://www.forbes.com/sites/brittanyhodak/2016/07/01/u-s-dept-of-justice-deals-crushing-blow-to-songwriters/#49d565111127 ...................................................................... 17

James Madison, *The Federalist No. 43* at 272 (Clinton Rossiter ed., 1961) .......................... 26, 27

Jean-Philippe Mikus, 1 *Copyright Throughout the World,* Canada, § 7:16 ................................. 10

Mike O'Neill, *Mike O'Neill Responds to the Recent Proposal From the US Department of Justice*, BMI (June 30, 2016) http://www.bmi.com/news/entry/mike_oneill_ responds_to_the_recent_doj_proposal. .................................................................................. 28

Donald S. Passman, *All You Need to Know About the Music Business* 304-05 (8th ed. 2013) ...... 5

Michael Pillow, *Liberty over Death: Seeking Due Process Dimensions for Freedom of Contract*, 8 Fla. A & M U.L. Rev. 39, 44–48 (2012) ............................................................................. 29

Ben Sisario, *Justice Department Won't Alter Music Industry Royalty Rules*, The New York Times (June 30, 2016) https://www.nytimes.com/2016/07/01/business/media/justice-department-wont-alter-music-industry-royalty-rules.html?_r=0 ....................................... 8-9, 18

Lawrence Tribe, *American Constitutional Law* § 10-7, at 667 (2d ed. 1988) ............................. 28

U.S. Copyright Office, Copyright and the Music Marketplace, 18-24 (2015), http://copyright .gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf ........................ 6, 7

U.S. Copyright Office, *PRO Licensing of Jointly Owned Works*, 15 (2016), https://www .copyright.gov/policy/pro-licensing.pdf. ......................................................................... *passim*

U.S. Dep't of Justice Antitrust Div., *Antitrust Division Manual* III-146 (5th ed. 2015) ............... 7

Paul Williams, *Message from ASCAP President Paul Williams on Strategy to Fight DOJ
Consent Decree Interpretation*, ascap.com (Aug. 8, 2016)
https://www.ascap.com/help/advocacy/doj-strategy. ............................................................. 22

**INTRODUCTION**

Songwriters are among the most pervasively and unfairly regulated "industries" in the United States. Vital to most songwriters' livelihoods is licensing rights to perform their works—part of the bundle of rights protected by copyright. But since 1941 the lion's share of songwriters' performance-right licensing has been regulated by two consent decrees as enforced by the Department of Justice.

The longstanding policy of the Department's Antitrust Division is that perpetual consent decrees are against the public interest; pursuant to Antitrust policy decrees typically expire after ten years. But songwriters have been subject to continuing monitoring and oversight of their business affairs by Antitrust for over 75 years. Entities as powerful as Comcast and even companies that have perpetrated frauds on consumers find their consent decrees terminated automatically after a set termination date, while the people who compose the lyrics and music that enrich our lives are deemed to require consent decrees with no termination date.

Now, with its August 4, 2016 determination mandating 100% licensing, the Department seeks not just to maintain its unremitting control and interference with the affairs of songwriters, but to expand the scope of its oversight to include dictating with whom songwriters such as plaintiffs may collaborate creatively in order to create the music that is so important to our culture. The Department's determination dramatically alters the long-understood meaning of the consent decrees and extends their operation even to songwriters who are not affiliated with the regulated PROs.

In their motion to dismiss the complaint, defendants try to misdirect from that plain fact by portraying their unprecedented and impermissible agency action as mere "clarification" to the consent decrees. It is difficult to say politely just how wrong that is.

Part of Antitrust's misdirection is to pretend that this case involves nothing more than regulating ASCAP and BMI concerning the proper interpretation of the consent decrees, but ASCAP and BMI own no copyrights and create no copyrighted musical works. The real parties

in interest here are the many individual songwriters who do create works and own the copyrights. They are the ones being directly harmed by defendants.

Plaintiffs raise claims that cut to the core of what we hold out to be our democratic values: the rights to freedom of speech, freedom of association, freedom to own and control one's intellectual property, and freedom from government interference with their most intimate creative relationships. And while it might suit Antitrust's rewriting of history in this case to reframe it as one concerning the interests of the ASCAP and BMI—sophisticated businesses with which Antitrust has had a relationship for years—plaintiffs are, or represent, the smallest of small-business owners in America. These are individual men and women who may well be composing music or lyrics at the kitchen table while they wait for their kids' school bus or in the evening after everyone else has gone to sleep.

Antitrust's new rule prohibiting fractional licensing has rocked the music industry. Antitrust issued the rule despite repeated warnings about the widespread disruptions that would result—warnings from dozens of industry participants small and large, individuals, companies, and associations, including plaintiff Songwriters of North America. Rather than own up to these disruptions, defendants' motion to dismiss seeks to further the charade that the determination has caused no harm, and to pretend that the determination is not a reviewable agency action.

But as shown in the complaint and in this opposition, plaintiffs have alleged and will prove at trial that Antitrust's new rule has caused immediate injuries and will cause imminent injuries to each plaintiff, thus establishing standing. Plaintiffs have also pleaded facts sufficient to show that the government's action is interfering with their freedom to contract, freedom of association, and freedom of speech, and that the government has taken their valuable intellectual-property rights without compensation, thus violating plaintiffs' substantive and procedural due-process rights.

Despite defendants' assertions to the contrary, no adequate remedy is available from the two rate courts that supervise the ASCAP and BMI consent decrees, given the numerous issues that relate not to those decrees but only to the constitutional and APA claims in the complaint

here. In short, plaintiffs assert entirely different claims which cannot be adequately addressed without a hearing from this Court. The claims stated by SONA and the individual songwriter plaintiffs are capable of and need redress in this Court. The motion to dismiss should therefore be denied.

## BACKGROUND

### 1. The Plaintiffs

Songwriters of North America (SONA) is a grassroots songwriter advocacy organization. Its roster of over 200 professional songwriter and composer members represent a broad range of musical genres and include Grammy, Emmy, and Academy Award-winning creators. SONA members license and collect public performance royalties through performance rights organizations (PROs), including ASCAP, BMI, SESAC, and GMR. Compl. ¶ 19.

Michelle Lewis, SONA's Executive Director, is a professional songwriter and composer. Lewis has written songs for such notable artists as Cher, Hillary Duff, Katherine McPhee, and others, and is the co-writer of the original music used on the popular children's television show *Doc McStuffins. Id.* ¶ 21.

Thomas Kelly is a professional songwriter and musician. A 2011 inductee to the Songwriters Hall of Fame, Kelly is best known for his songwriting partnership with Billy Steinberg. Kelly and Steinberg have written numerous hit songs, including five number one singles in the 1980s. Examples of Kelly's work include "True Colors," recorded by Cyndi Lauper and Phil Collins; "I'll Stand by You," recorded by The Pretenders, "I Touch Myself," recorded by Divinyls, "Like a Virgin," recorded by Madonna, and "So Emotional," recorded by Whitney Houston. *Id.* ¶ 21.

Pamela Sheyne, a member of SONA, is a professional songwriter and composer. Sheyne is probably best known for co-writing Christina Aguilera's Grammy Award-winning single "Genie in a Bottle," and has also written songs for Dream, Jessica Simpson, the Backstreet Boys,

and other artists, as well as soundtracks to films such as *Pokemon: The Movie, The Princess Diaries*, and *Sonny With a Chance*. *Id.* ¶ 23.

The individual plaintiffs have varied relationships with PROs: Lewis is a longtime member of ASCAP who has co-authored songs with many songwriters who are not ASCAP members; Kelly is affiliated with GMR, while his longtime collaborator is a member of ASCAP; and Sheyne was until recently affiliated with BMI. *Id.* ¶¶ 20–22. All the plaintiffs have been immediately and significantly harmed by defendants' agency action. In particular, Sheyne had planned to move to SESAC, but as discussed below that plan has been undermined by the fact that she has co-written songs with ASCAP and BMI writers who are subject to the full-licensing mandate in the August 4, 2016 determination. *See id.* ¶¶ 21–23.

## 2.  Copyright and Collaboration

Songwriters and composers often collaborate in creating musical works. Indeed, the majority of popular songs on the charts today are created by multiple writers. This collaboration can occur in a variety of ways: In the traditional model, a songwriting team jointly composes the music and lyrics; but in the contemporary music marketplace co-written works arise in numerous ways, complicating and expanding the variety and scope of contractual arrangements among collaborators. For instance, temporary collaborations are formed for the purposes of special projects; independent contributions to a work are sourced from various artists and later combined into a single work, which is particularly common in urban music; and earlier works are sampled or remixed into new works (with a percentage of royalties and songwriting credit going to the author of the sampled or remixed work).

An individual songwriter who creates a musical work enjoys intellectual-property rights in the work: specifically, a copyright. Among other exclusive rights, this intellectual property includes the right to authorize others to publicly perform the work. 17 U.S.C. § 106. When two or more creators intend for their respective contributions to be merged into a single work, under U.S. copyright law that work is considered a "joint" work. Compl. ¶¶ 28, 31; 17 U.S.C. § 101.

Assuming they do not make a different arrangement—as discussed below—co-authors are subject to the "joint author rule": each co-author (joint author) enjoys an equal share of the work, and any one of the co-authors may grant a nonexclusive license to use the work in its entirety, provided that the licensing author accounts to his or her co-author for the co-author's share of royalties. *Id.* ¶ 31; 2 William F. Patry, *Patry on Copyright* § 5.9 (2014). More than two authors, of course, may also contribute to a single work.

The Copyright Act expressly permits copyright owners to override the joint author rule by dividing and/or reapportioning their rights and interests in particular works—including musical works. 17 U.S.C. § 201(d)(2). Indeed, given the wide variety of collaborations and the differing contributions to the work and bargaining power of the collaborators, the music industry's prevailing practice is to alter the joint author rule by agreements between co-authors, allowing co-owners to take appropriate shares of a work and to administer and grant licenses only for their respective share. This is known as "fractional" licensing. Compl. ¶ 31; Donald S. Passman, *All You Need to Know About the Music Business* 304–05 (8th ed. 2013). Co-owners may also alter their arrangements in a variety of other ways, including prohibiting any co-owner from independently licensing a work. *See, e.g.*, *Corbello v. DeVito*, 832 F. Supp. 2d 1231, 1244 (D. Nev. 2011) (explaining that "[j]oint owners may agree by contract that none of them shall independently license a work"); *see also* 1 Paul Goldstein, *Goldstein on Copyright* § 4.2 n.5 (stating that "the coauthors can contractually limit the freedom that each would otherwise enjoy to exploit the work without permission from the others"). This may be done to preserve creative control and a work's artistic integrity—something that is understandably of key importance to authors as how a work is used impacts an authors' freedom of expression. *See* Matthew J. Cursio, *Born to Be Used in the USA: An Alternative Avenue for Evaluating Politicians' Unauthorized Use of Original Musical Performances on the Campaign Trail*, 18 Vill. Sports & Ent. L.J. 317, 317–19 (2011).

### 3. ASCAP, BMI, and the Consent Decrees

One important area of the market for music generally is the market for rights to perform music. This market includes, on the one hand, millions of songs controlled by copyright owners and, on the other, countless user entities that want permission to play music—ranging from bars and restaurants to radio and television to internet streaming services. U.S. Copyright Office, *Copyright and the Music Marketplace*, 18–24 (2015) ("*Music Marketplace*"), http://copyright .gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf**.** Both copyright owners and music users rely on the PROs—ASCAP, BMI, GMR, and SESAC—to issue and administer licenses to perform musical works in the United States. *Id*. at 32–33. The PROs typically issue "blanket" licenses that grant users (licensees) the performance rights in all the copyright interests that each PRO represents. Compl. ¶ 28.

An individual songwriter or composer can belong to only one PRO. U.S. Copyright Office, *PRO Licensing of Jointly Owned Works*, 15 (2016) ("*PRO Licensing*"), https://www .copyright.gov/policy/pro-licensing.pdf. The PROs compete among themselves for members, in part by offering different membership terms and methodologies for distributing royalties. The distinctions among PROs are important to songwriters and composers, who choose their affiliation based on their perception of which organization will bring the most benefit. Compl. ¶ 29.

Another option when a songwriter or composer creates a song is to assign his or her copyright interest in the song to a music publisher, who will assist in marketing and licensing the work in exchange for a portion of the income derived from the work. *PRO Licensing* at 11. Music publishers, too, affiliate with PROs in order to collect their share of performance royalties. *Id.* ¶ 30.

This market between music-rights owners and music users is subject to pervasive government regulation. That regulation began about 75 years ago, in 1941, when both ASCAP and BMI began operating under consent decrees that were entered into to resolve antitrust claims asserted by the government. *Music Marketplace* at 36.

The ASCAP and BMI consent decrees have no sunset provisions. *See id.* at 36. This perpetual duration differs from most consent decrees with the federal government nowadays: In 1979, Antitrust announced that settlements from then onward would usually terminate after ten years, because "perpetual decrees were not in the public interest." U.S. Dep't of Justice Antitrust Div., *Antitrust Division Manual* III-146 (5th ed. 2015); *see also* 60 Fed. Reg. 42569 (FTC will ordinarily terminate competition and consumer-protection administrative orders automatically after 20 years).

Since 1941 numerous technological developments have affected the market, in particular the internet and the rise of online music services. While in theory this should hold great promise for the people who create music, it has become increasingly difficult—in part because of the restrictions on the free market imposed by the consent decrees—for songwriters and composers to make a living in the internet age. Indeed, many songwriters and composers have seen a sharp decline in their incomes and find it difficult to earn a viable income practicing their craft. *Music Marketplace* at 69–80. In part this is due to the regulation imposed by the consent decrees, which leaves songwriters and composers with little control over the licensing of their works or the rates at which they are paid. Compl. ¶¶ 1, 37; *Music Marketplace* at 76.

**4.   The Justice Department's August 2016 Determination**

Given the internet-age challenges facing songwriters and the PROs' interests (on behalf of songwriters) in offering a wider variety of options to licensees, ASCAP and BMI in 2014 asked Antitrust, the arm of the government that oversees the consent decrees, to consider modifying the 75-year-old decrees to allow for more flexible licensing practices. Compl. ¶ 5.

Following a two-year review, on August 4, 2016, the Justice Department announced that "[t]he [Antitrust] Division has now concluded its investigation." Determination at 3.[1] Rather than

---

[1] A copy of Dep't of Justice, Statement of the Department of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees ("Determination") is attached as Exhibit 1 to the Declaration of Steven I. Wallach, dated February 7, 2017.

granting the PROs' requests, Antitrust announced an extraordinary new rule. Under the new Antitrust mandate, ASCAP and BMI are now required to provide "full-work" (or "100%") licenses for all the songs in their repertories, even if the PRO in question does not represent all of the co-writers of the song—or face an antitrust enforcement action (the 100% Mandate). Compl. ¶ 6; Determination at 3.

The 100% Mandate upends thousands, if not millions, of existing private contracts, in which songwriters agree among themselves to divide their copyright interests in a work according to their contributions and intentions for their collaboration, and each agrees to license only their proportionate share of that work through the PRO of their choice. Songwriters are permitted to do this under the copyright laws of the United States. *See PRO Licensing* at 28. Songs that cannot be licensed by either ASCAP or BMI on a 100% basis due to contractual restrictions—or for any other reason—can no longer be included in that PRO's repertory. *Id.*; Compl. ¶ 7.

Although Antitrust pretends otherwise, calling the new rule a "clarification," the Determination recognizes that songwriters as well as PROs will need significant time to implement the new rule,[2] and that the rule will require wholesale renegotiations of the many songwriting agreements undergirding the efficient operation of the music-licensing marketplace. *See* Ben Sisario, *Justice Department Won't Alter Music Industry Royalty Rules*, The New York Times (June 30, 2016) https://www.nytimes.com/2016/07/01/business/media/justice-department-wont-alter-music-industry-royalty-rules.html?_r=0 (The new "policy" goes against "decades of industry

_____

[2] Antitrust concedes that "any move to this common understanding will require adjustment by some market participants," and so "the Division will not take any enforcement action based on any purported fractional licensing by ASCAP and BMI for one year"—but only "as long as ASCAP and BMI proceed in good faith to ensure compliance" with the consent decrees as Antitrust now interprets them. Determination at 17–18. To show good faith, "the Division expects that ASCAP and BMI will take the steps necessary to eliminate such uncertainty" about the PROs' ability to license specific works by "obtaining from songwriter and publisher members the assurances they need and, to the extent necessary, removing works from their licenses if they cannot be offered on a full-work basis." *Id.* at 18.

practice."). Journalists covering the music industry could find no precedent or history of 100%
licensing, but noted that the Justice Department "has, somehow, become convinced that it is
common practice …." Ed Christman, *The Dept. of Justice Said to Be Considering a Baffling New
Rule Change for Song Licensing*, Billboard, (July 30, 2016) http://www.billboard.com/articles/
business/6649208/the-dept-of-justice-said-to-be-considering-a-baffling-new-rule-change-for.

Belying the pretense that the new rule is a mere clarification, Antitrust spends numerous
pages of the Determination explaining to songwriters and the PROs how they should re-order
their affairs in order to comply with the 100% Mandate. For instance, Antitrust proposes that "if
co-writers have a contract that prevents each co-owner from licensing the song on a full-work
basis and those co-owners are members of different PROs, the co-owners may amend their
contract either to revert to the default rule or to choose a single PRO as the licensing agent for
the song, and agree on a manner to distribute revenue from that work." Determination at 19. So,
"for a song co-written by one ASCAP member and one BMI member," the Division suggests as
one option that the co-writers "designate the ASCAP member to collect all revenues from the
licensing of public performance rights to the song and require that the ASCAP member distribute
a share of the revenues to the BMI member." *Id.* The Division blithely concludes that "[t]his
discussion merely seeks to illuminate what rightsholders can do if they wish to facilitate the
PROs ability to license their songs consistent with the requirements of the consent decrees." *Id.*

As its directions to songwriters demonstrate, Antitrust expects that songwriters will
(1) renegotiate agreements among themselves; (2) designate one of the co-writers to collect all
royalties from their PRO; and (3) require that co-writer to assume the expense and liability for
distributing appropriate shares of the revenues to other co-writers. Determination at 19–20. If
songwriters are unwilling or unable to accomplish such an arrangement, they must withdraw
affected songs from the repertories of their respective PROs and forego associated licensing
opportunities and revenues. *See id.*

As a consequence of the 100% Mandate, songwriter and composer members of ASCAP
or BMI who lack the authority to grant rights to their co-writers' shares, or who wish to continue

their longstanding arrangements with co-writers to license only their own shares, will lose both

the right to license their co-authored works through ASCAP or BMI and all associated revenue.

Determination at 19. This includes writers who collaborate with foreign authors and rely upon

ASCAP or BMI to represent their works for licensing in the United States, because under many

foreign laws a single author is legally unable to grant rights to a co-author's share. Compl. ¶ 8.

*See, e.g.*, 1 Jean-Philippe Mikus, *Copyright Throughout the World,* Canada, § 7:16; *Forget v.

Specialty Tools of Canada Inc.*, (1995), 62 C.P.R. (3d) 537 (B.-C. C.A.).

**5.   Consequences of the August 2016 Determination**

The 100% Mandate abrogates songwriters' and composers' rights under U.S. copyright

law to separately control the licensing and administration of their copyright interests. The

Copyright Act expressly permits authors to divide, and separately own and exploit, the works

they create with others. Compl. ¶ 11; 17 U.S.C. § 201(d)(2).

Antitrust seeks to portray the 100% Mandate as a "confirmation" of existing practice

under the consent decree; that is a fiction. Determination at 3. In reality, the PROs—and the

music industry generally—have long administered and collected royalties for only the shares of

songs they represent: the practice of fractional licensing. Compl. ¶ 32. Indeed, in the August

2016 Determination, Antitrust acknowledged as much by allowing ASCAP and BMI one year to

"transition to" and "comply[] with" the 100% Mandate. Compl. ¶ 12; Determination at 4.

Tellingly, in responding to one songwriter's concerns about the impact of the 100%

Mandate on the songwriting community, a representative of Antitrust suggested that songwriters

could simply resign from ASCAP. Compl. ¶ 14. *See also* Determination at 19 ("Co-writers of

songs remain free to split up their joint rights by contract in a way that makes their songs

unlicensable by ASCAP or BMI.").

The Determination essentially directs every songwriter in the nation to undertake the

burdensome and potentially costly process of revisiting and amending their core business

practices, private contracts, and collaborative relationships—that is, to reorder their economic

and creative lives—in order to accommodate the 100% Mandate. Antitrust's casual disregard for the welfare and livelihoods of America's songwriters and composers cannot be overstated. *Id.* ¶ 15.

Antitrust's 100% Mandate will have a profound and lasting detrimental impact on music creators. As openly acknowledged by Antitrust, under the new rule, songwriters and composers will, among other things:

- Be deprived of the ability to choose the PRO that will license their shares of co-authored works, *see* Determination at 19;

- Be required to withdraw works from representation by ASCAP or BMI, *see* Determination at 19;

- Have songs that they must license outside of the PRO system, Determination at 19–20;

- Need to cede administrative control over their copyrights, including the right to collect royalties, to unaffiliated third parties, Determination at 19;

- Be compelled to renegotiate existing contractual relationships on a song-by-song basis, Determination at 19–20;

- Be forced to consider whether they should decline to collaborate with creators who are not members of the same PRO, Determination at 19; and

- Have reason to consider withdrawing from ASCAP or BMI altogether, Determination at 19–20.

Compl. ¶ 16.

### 6.  The Purpose of Copyright Law

The August 2016 Determination overlooks some fundamental aspects of copyright law. To begin with first principles, the Constitution's Copyright and Patent Clause grants Congress power "[t]o Promote the Progress of Science and the Useful Arts by granting to authors and inventors for limited times the exclusive rights to their respective Writings and Discoveries."

Congress has promulgated the patent law to promote the progress of the useful arts for inventors and their discoveries, and the copyright law to promote the progress of science (in the 18th-century sense of the word) for authors and their writings. 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.03 (rev. ed. 2015). The Supreme Court thus explains that copyright exists "to encourage people to devote themselves to intellectual and artistic creation" and that therefore Congress "guarantee[s] to authors and inventors a reward in the form of control over the *sale or commercial* use of copies of their works." *Goldstein v. California*, 412 U.S. 546, 555 (1973) (emphasis added).

Remunerating authors is not "a secondary consideration"; "copyright law celebrates the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge …. The profit motive is the engine that ensures the progress of science." *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) (internal citation omitted). "The economic philosophy behind the [Copyright and Patent] Clause … is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors." *Id*. (Quoting *Mazer v. Stein*, 347 U.S. 201, 219 (1954)). Stated differently, "the premise of our copyright system is that authors' rights and the public good are complementary" and "the copyright monopoly is a necessary condition to the full realization of [copyrightable] creative activities." 1 Melville B. Nimmer & David Nimmer*, Nimmer on Copyright* § 1.03[A] (rev. ed. 2015).

The August 2016 Determination gives every indication that Antitrust has lost sight of these fundamentals. When weighing the benefits of traditional fractional licensing with its proposed 100% licensing, Antitrust views the market and its participants too narrowly, ignoring that "[a]uthors are the heart of copyright." Jane C. Ginsburg, *The Concept of Authorship in Comparative Copyright Law*, 52 DePaul L. Rev. 1063, 1064 (2003). "Much of copyright law in the United States and abroad makes sense only if one recognizes the centrality of the author, the human creator of the work." *Id*.

In particular, the only support that Antitrust provides for its conclusion that full-work licensing alone succeeds at obtaining procompetitive benefits is the 100% Mandate's added convenience to licensees—so that they can perform all the music in a PRO's repertory immediately after just one deal. Determination at 12. But Antitrust fails to explain how this benefit to licensees might outweigh the reciprocal loss of songwriters' incentives that are necessary to promote the progress of science.

Antitrust also ignores the axiom that without incentives for authors to create, society cannot benefit from their creativity. Instead, Antitrust views the market and the 100% Mandate's supposed benefit through the narrow lens of how music purchasers gain, giving scant recognition to the broader reality that the music industry exists to enrich all of society. And so Antitrust treats the songwriters and others who create the music—along with the PROs through which creators get compensated when their music is performed—as an afterthought. *See* Determination at 12 (concluding that "only full-work licensing achieves the benefits that underlie the courts' descriptions and understandings of ASCAP's and BMI's licenses."); Chris Castle, *The Obama Administration Is Lame Ducking an Unworkable Burden on Songwriters: 4 Reasons Why It's Bad Law*, The Huffington Post (July 12, 2016) http://www.huffingtonpost.com/chris-castle/the-obama-administration-_6_b_10903474.html ("adopt[ing] the punitive policy of '100% licensing' to the great benefit of Google once again.").

## ARGUMENT

### I. Plaintiffs have standing because they are now suffering and will imminently suffer injuries traceable to defendants' agency action.

A.  Legal Standards for Rule 12(b)(1)

The Justice Department's motion to dismiss is based on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Though related, the standards governing these rules are slightly different. We address the standards for Rule 12(b)(1) in this section and those for Rule 12(b)(6) in Section II.A, *infra*.

Rule 12(b)(1) allows a party to move to dismiss "for lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Courts considering a Rule 12(b)(1) motion "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [a] plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). A plaintiff "bear[s] the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction." *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 176 (D.D.C. 2004). This Court "may consider materials outside of the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Dismissing a complaint for a lack of subject-matter jurisdiction is improper unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Richardson v. U.S.*, 193 F.3d 545, 549 (D.C. Cir. 1999) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1086 (D.C. Cir. 1998)).

**B.   The Court has jurisdiction over this action because plaintiffs meet the case-or-controversy requirement.**

To meet the constitutional minimum for an Article III Court to have jurisdiction over its claims, a plaintiff must only establish that it seeks the Court's intervention with regard to an actual "case[] or controver[sy]." *Allen v. Wright*, 468 U.S. 737, 750 (1984) (internal quotations omitted). Standing and ripeness are necessary to have a "case or controversy." *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 23 (D.D.C. 2013).

**1.   Plaintiffs have established all the elements of standing.**

To have standing to assert a claim in an Article III court, the plaintiff must demonstrate "(1) that she has suffered 'injury in fact;' (2) that the injury is 'fairly traceable' to the defendant's actions; and (3) that a favorable judicial ruling will 'likely' redress the plaintiff's injury." *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 431 (D.C. Cir. 1998) (quoting *Bennett v. Spear,*

520 U.S. 154, 162 (1997)). Here, plaintiffs allege each element and thus have standing under the Constitution.

### a. Plaintiffs have suffered injuries in fact.

Injury in fact is the 'invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007) (citations omitted). Rights in property, such as contracts, are legally protected interests. *See Idaho Power Co. v. FERC*, 312 F.3d 454, 460 (D.C. Cir. 2002), *as amended on reh'g* (Mar. 5, 2003). As the appeals court ruled, regulations that interfere with contracts cause injuries to a protected interest and create standing. *Id.* ("'[T]he reality [is] that contract duration is a measure of value.' Because Idaho Power possesses a legally-protected interest in entering a longer-term contract, it suffered a cognizable injury when it was compelled to forgo a 10-year contract with IP Merchant and instead enter a shorter-term contract with its associated market risks. That injury was immediate, concrete, and particularized.") (Quoting *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1140 (D.C. Cir. 1996)).

Plaintiffs here have suffered multiple injuries. Plaintiffs who are members of ASCAP or BMI have been instructed that they must revise their contracts with co-writers within a one year period to comply with the 100% Mandate or forego licensing income from those works. Compl. ¶ 56; Determination at 17–18. This is an immediate, concrete, and particularized injury. It is immediate, because plaintiffs are under a current order from Antitrust to find any relevant co-authors and renegotiate contracts by August 4, 2017. *See* Determination at 17–18. The injury is concrete and particularized because, should they elect to do so, renegotiating and properly administering new agreements will cause plaintiffs to incur substantial legal, administrative, and accounting fees. *See* Compl. ¶¶ 16, 56–58. Moreover, many co-writer agreements contain terms departing from the default joint author rule and prohibiting any one writer from licensing their share of the work without the consent of his or her co-writers. *PRO Licensing* at 10. *See*

Compl. ¶ 8. Such provisions exist to ensure shared creative control over certain aspects of licensing. *See PRO Licensing* at 10. Should one co-writer decline to revert to the default rule for this or any other reason, or decline to allow one PRO to administer all royalty payments for the collaboration, plaintiffs must forgo licensing fees from participating in any PRO. *See* Compl. ¶¶ 16, 57–58; Determination at 19.

Likewise, in any collaboration affected by the 100% Mandate, at least one collaborator will be denied the freedom to contract with his or her preferred PRO. *See* Compl. ¶¶ 16, 56–58; Determination at 19 ("[T]he co-owners may amend their contract either to revert to the default rule or to choose a single PRO as the licensing agent for the song."). Because songwriters choose to affiliate with a PRO based on multiple factors—including membership terms; royalty-calculation and -distribution practices; claim-adjustment procedures; training, networking, and education practices; and benefits such as advances, loans, and guarantees—plaintiffs will suffer innumerable harms. *See PRO Licensing* at 17 ("The PROs compete for songwriter members based on several criteria, including membership terms, royalty calculation and distribution practices, claim adjustment procedures, training, networking, educational and other benefits, such as potential provision of advances, loans or guarantees.") (footnotes omitted).

Renegotiating contracts in and of itself subjects plaintiffs to uncertainty and the possibility of worse outcomes due to shifts in bargaining power, transfers of ownership, or any number of other possible changes in the marketplace since the original agreement was executed. Compl. ¶ 57. As the appeals court held in *Idaho Power*, uncertainty is itself an immediate injury. 312 F.2d at 460 ("[A]n agency ruling that replaces a certain outcome with one that contains uncertainty causes an injury that is felt immediately and confers standing.").

Relatedly, plaintiffs are suffering injury to their "freedom to contract," which imbues individuals with the right to freely sell or license their property. *S. Power Co. v. N. Carolina Pub. Serv. Co.*, 263 U.S. 508, 509 (1924). Antitrust's 100% Mandate restricts this freedom. Compl. ¶¶ 16, 56–58; Determination at 19. This unprecedented agency meddling by Antitrust with the economic and personal relationships of millions of songwriters clearly confers standing.

Plaintiffs also allege, as Antitrust conceded, that songwriters are currently harmed because their contracts with PROs have been either significantly or completely abrogated. As a result, these contracts must be renegotiated. Compl. ¶¶ 16, 54–58 ("Antitrust's acknowledgment that under the 100% Mandate, some works will become 'unlicensable.'"); Determination at 19.

Even with contract renegotiations, harms will persist. The example of plaintiff Pamela Sheyne is illustrative. Due to the uncertainty inherent in a continued relationship with BMI, she resigned from BMI as suggested by defendants, but experienced difficulties while trying to join SESAC. Compl. ¶ 57. SESAC refused to advance any of her royalties or finalize her affiliation deal due to the tremendous uncertainty—created by the 100% Mandate—regarding how her royalties will be collected or apportioned, because many of her most valuable songs are co-written with ASCAP and BMI writers. Compl. ¶ 57. Furthermore, Sheyne was experiencing "lost profits" so long as she had no agreement with a PRO and was unable to efficiently license the public performance of her works in the myriad venues PRO blanket licenses cover. Compl. ¶ 57. More broadly, all plaintiffs' freedom to contract is infringed because they are prevented from entering into fractional-licensing contracts with ASCAP and BMI, who may be their preferred PROs. Compl. ¶¶ 16, 30–33, 36, 56–58.[3] Plaintiffs also allege facts sufficient to establish injury to the constitutionally protected right of freedom of association. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) ("[T]he Court has recognized a right to associate for the purpose of engaging in activities protected by the First Amendment—speech, assembly, petition for the

---

[3] These problems have been widely recognized in the trade press. Songwriters like Sheyne now experience "tremendous amount of uncertainty and chaos in a marketplace that has worked well for years and will adversely impact everyone in the licensing process, including PROs, licensees, music publishers and most of all songwriters who can ill afford to hire lawyers to figure out their rights under this inexplicable ruling. The decision raises more questions than answers." Brittany Hodak, *U.S. Dept. Of Justice Deals Crushing Blow To Songwriters*, Forbes, (July 1, 2016), http://www.forbes.com/sites/brittanyhodak/2016/07/01/u-s-dept-of-justice-deals-crushing-blow-to-songwriters/#49d565111127. Antitrust upended a "marketplace [that] has worked out on its own over the last half-century." Ed Christman, *"Disappointing": Publishing Industry Expresses Confusion, Concern, Over Sweeping Dept. of Justice Decision*, Billboard, (July 5, 2016), http://www.billboard.com/articles/business/7424128/publishing-industry-ascap-bmi-sony-atv-umpg-confusion-concern-blanket-licenses-100-percent.

redress of grievances, and the exercise of religion."). "[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id*. at 622.

Plaintiffs are being denied their protected rights of freedom of speech and freedom of association because Antitrust restricted the right to co-write songs freely and, therefore, associate and exercise free speech. Authorship is the *sine qua non* of free speech and copyright is the "engine of free expression." *Golan v. Holder*, 132 S. Ct. 873, 890 (2012). By denying plaintiffs the freedom to choose their songwriting partners Antitrust is not merely meddling with a commercial relationship—the government is stifling the voices of songwriters across the country and interfering in personal relationships that are among the most intimate and cherished between artists. *See* Compl. ¶¶ 16, 56–58; *see also* Ben Sisario, *Justice Department Won't Alter Music Industry Royalty Rules*, The New York Times (June 30, 2016) https://www.nytimes.com/ 2016/07/01/business/media/justice-department-wont-alter-music-industry-royalty-rules.html?_ r=0 (Michelle Lewis, now a plaintiff here, explains that "[y]ou write with who you have chemistry with; their choice of P.R.O. should not figure into it, but if we have to with this administrative nightmare we are not going to collaborate."). Courts have held that simple impediments to freedom of association are enough to cause harm. *See, e.g.*, *Application of Stolar*, 401 U.S. 23, 28 (1971) (holding that a requirement to name organizations of which individuals were members to apply to a law school is unconstitutional.) Here, rather than imposing a minor impediment to collaboration, Antitrust has erected obstacles to songwriters' willingness and ability to express themselves creatively that, in some cases, will be insurmountable. Compl. ¶¶ 16, 57–58. *See* Determination at 19.

Defendants' reliance on *Hunt v. Wash. State Apple Advers. Comm'n* and related cases, which establish that a membership organization must show that "at least one member who would have standing to sue in his or her own right" (Defs. Mem. 10) in order to bring a suit is baffling; plaintiffs have met all the requirements set forth in those cases. *See* 432 U.S. 333, 343 (1977).

Plaintiffs describe how a specific member of its organization is injured and thus sufficiently allege how an "identified member suffers harm." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see also Hunt*, at 343; Compl. ¶ 57. Furthermore, as previously discussed, the complaint describes how each plaintiff is harmed in numerous specific ways that satisfy the requirements for standing and how Sheyne in particular has suffered unique harms. Compl. ¶ 57.

### b. Plaintiffs' injuries are traceable to defendants' conduct and redressable by the Court

Plaintiffs' injuries are "fairly traceable" to defendants' agency action because plaintiffs do not have to "show that the [agency action] was the very last step in the chain of causation. Rather, plaintiffs can meet their burden by demonstrating that the [agency action] had determinative or coercive effect on action of someone else." *Bldg. Indus. Ass'n of Superior Cal.v. Babbitt*, 979 F. Supp. 893 (D.D.C. 1997) (quoting *Bennnett*, 117 S. Ct. at 1164.). Plaintiffs clearly allege how defendants have injured them. As plaintiffs seek an injunction, there is no question that the injury is redressable. *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C. Cir. 1990) ("The questions whether the injury alleged is 'fairly traceable' to the purportedly illegal conduct and whether the relief requested is 'likely to redress' the injury substantially overlap where the petitioners seek only the cessation of the illegal conduct.").

In circumstances analogous to those here, the Supreme Court has held that when a regulated party has a contract with an unregulated party, the unregulated party has standing. *See Columbia Broad. Sys. v. U.S.*, 316 U.S. 407, 423 (1942) ("*CBS*"). In *CBS*, the Federal Communications Commission altered requirements for affiliates to receive licenses, forcing the parties to renegotiate existing contracts. *Id*. In this case, Antitrust goes even further —requiring both directly and indirectly regulated parties to renegotiate contracts. That is, Antitrust is requiring songwriters and the two major U.S. PROs to renegotiate contracts and has given everyone affected—including plaintiffs—a year to do so, leaving them without the benefit of

previously valuable contracts, and potentially diminishing the benefit of future contracts. Compl.
¶ 56.

That the Determination involves the consent decrees and directly impacts ASCAP and
BMI does not diminish plaintiffs' standing. *See CBS*, 316 U.S. at 422 ("Appellant's standing to
maintain the present suit in equity is unaffected by the fact that the regulations are not directed to
appellant and do not in terms compel action by it or impose penalties upon it because of its
action or failure to act."). Plaintiffs here clearly allege that contractual rights will be altered and
diminished, and that they will be deprived of licensing revenue should they fail to act, so there is
an adequate injury. *See id.* ("It is enough that, by setting the controlling standards for the
Commission's action, the regulations purport to operate to alter and affect adversely appellant's
contractual rights and business relations with station owners whose applications for licenses the
regulations will cause to be rejected and whose licenses the regulations may cause to be
revoked.").

Defendants place undue importance on the statement in *Lujan v. Defenders of Wildlife*
that it is harder for a party harmed by the regulation of another party to have standing because
"causation and redressability ordinarily hinge on the response of the regulated (or regulable)
third party to the government action or inaction—and perhaps on the response of others as well."
*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). In the instant case, not only has Antitrust
been quite clear in its directive, but the immediate consequences of its actions are already being
felt as plaintiffs alleged: Songwriters cannot receive advance royalties, co-write songs with BMI
and ASCAP members, or finalize contracts with unregulated PROs. Compl. ¶ 57.

### 2. This action is ripe because plaintiffs are feeling the effects of the agency action in a concrete way.

An action is ripe when it is not an "abstract disagreement[] over administrative policies."
*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003)
(quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967)). Ripeness depends on
"(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of

withholding court consideration." *Id.* at 808. After conducting a two-year investigation and issuing the August 2016 Determination setting forth the 100% Mandate and specific directives to the affected parties, Antitrust continues disingenuously to portray the Determination as nothing more than a "litigation position" not ripe for consideration. Defs. Mem. 18; Determination at 3. Nothing could be further from the truth.

Plaintiffs' complaint presents issues fit for decision because the rulemaking agency has pronounced a final rule that has caused the "effects [to be] felt in a concrete way by the challenging parties." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 808. Plaintiffs are already suffering from uncertainty, having to renegotiate contracts, and a loss of income. And their suffering only worsens the longer the Court delays granting them relief. Compl. ¶¶ 16, 30–35, 55–58.

Plaintiffs' claims therefore do not "rest[] upon contingent future events" that "may not occur at all," *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 425 (D.C. Cir. 2007) (quoting *Texas v. U.S.*, 523 U.S. 296, 300 (1998)). Plaintiffs instead face a current and "imminent or certainly impending injury" that entitles them to the Court's intervention now. *Chlorine Inst., Inc. v. Fed. R.R. Admin.*, 718 F.3d 922, 927 (D.C. Cir. 2013).

### C.  This Court will not be interfering with the Southern District of New York.

Defendants wrongly suggest that even if plaintiffs have met the requirements of standing and ripeness, the complaint should still be dismissed, because this Court's adjudication of plaintiffs' constitutional and APA claims would "interfere with another court's administration of an order"—the antitrust consent decrees issued by the rate courts in the Southern District of New York beginning in 1941. Defs. Mem. 11. But the issues raised by the complaint here are sufficiently disparate that there would be no offense to "'considerations of comity, consistency of treatment, and orderly administration of justice.'" Defs. Mem. 12 (quoting *Martin-Trigona v. U.S.*, 779 F.2d 72, 73 (D.C. Cir. 1985) (per curiam)).

That is because numerous issues are raised by plaintiffs' claims that have nothing to do with the rate courts' superintendence of the consent decrees. Plaintiffs' constitutional claim is based on theories that the 100% Mandate violates plaintiffs' rights of procedural and substantive due process, and takes their property without compensation. Compl. ¶¶ 61, 62. And because plaintiffs' APA claim is based on theories that that the Determination: was outside the Justice Department's authority to adopt; is arbitrary and capricious; and is otherwise unlawful. Compl. ¶¶ 65–69.

Moreover, the state of the proceedings—or lack thereof—in the two rate courts indicates that there is no other court where the plaintiffs could reasonably be heard. BMI challenged the 100% Mandate in its rate court; Judge Stanton issued a limited declaratory judgment; and the Justice Department filed a notice of appeal. *U.S. v. Broad. Music Inc.*, 1:64-cv-03787 (S.D.N.Y.). Meanwhile, ASCAP has not taken any action regarding the 100% Mandate in its rate court, and by all appearances will not do so, choosing instead to lobby Congress. Paul Williams, *Message from ASCAP President Paul Williams on Strategy to Fight DOJ Consent Decree Interpretation*, ascap.com (Aug. 8, 2016) https://www.ascap.com/help/advocacy/doj-strategy. The existence of the rate courts and their administration of the antitrust consent decrees therefore provide no basis for concluding that this Court lacks jurisdiction over plaintiffs' constitutional and APA claims.

### D.  This Court has jurisdiction over plaintiffs' valid taking claim.

Although defendants discuss plaintiffs' taking claim while arguing that plaintiffs failed to state a claim (Defs. Mem. 15–16), the crux of their argument actually pertains to whether "the district court should accept jurisdiction," so it is more appropriately discussed with other jurisdictional questions. *See Transohio Sav. Bank v. Dir., Office of Thrift Supervision,* 967 F.2d 598, 613 (D.C. Cir. 1992). For this Court to have jurisdiction over the taking claim, there must be either: (1) an "uncompensable injury"; (2) a taking from one private party to give to another with no public purpose; or (3) failure to provide "'advance assurance of adequate compensation in the event of a taking.'" *See Detroit Int'l Bridge Co. v. Gov't of Canada*, 133 F. Supp. 3d 70,

97 (D.D.C. 2015), *amended on denial of reconsideration*, No. CV 10-476 (RMC), 2016 WL

3030226 (D.D.C. May 26, 2016) (quoting *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,

438 U.S. 59, 71 n.15 (1978)).

The injuries suffered by plaintiffs here cannot be compensated, and the Justice

Department has communicated that it will provide no compensation. The taking claim is

therefore properly before the Court.

As to plaintiffs' uncompensable injury, the general rule is that "taking claims against the

Federal Government are premature until the property owner has availed itself of the process

provided by the Tucker Act." *Preseault v. ICC*, 494 U.S. 1, 11 (1990). But Antitrust ignores that

the Supreme Court has also said that the Declaratory Judgment Act "allows individuals threat-

ened with a taking to seek a declaration of the constitutionality of the disputed governmental

action before potentially uncompensable damages are sustained." *E. Enterprises v. Apfel*, 524

U.S. 498, 521 (1998); *Detroit Int'l Bridge Co.*, 133 F. Supp. 3d at 97–98 ("Declaratory Judgment

Act allowed the claim to be brought in district court" because it sought equitable relief of

uncompensable taking).

The Supreme Court in *Apfel* cites two cases where injury was uncompensable. *Apfel,* 524

U.S. at 521–22. In *Babbitt v. Youpee*, the encumbrance of one's ability to bequeath property was

uncompensable. 519 U.S. 234, 244 (1997) ("virtually the abrogation of the right to pass on a

certain type of property—the small undivided interest—to one's heirs."). In *Hodel v. Irving*, the

loss of the right "to pass on valuable property" is also uncompensable. 481 U.S. 704, 715 (1987).

In this case, defendants are similarly encumbering plaintiffs' property in two ways. First,

defendants are interfering with the conditions under which plaintiffs create art and thus create

intellectual property (i.e., copyrighted works).Compl. ¶¶ 16, 56–58 Second, Defendants are

abrogating plaintiffs' right to license fractional interests in that intellectual property, and thus are

abrogating the right to "pass on a certain type of property.*" Id*. ¶¶ 16, 30–35, 56–58; *Babbitt*, 519

U.S. at 244. These rights are uncompensable and plaintiffs are entitled to declaratory judgment.

This Court also has jurisdiction because the Justice Department has indicated it will provide no compensation for the loss in value of songwriters' contracts and the lost ability to efficiently license their songs. Compl. ¶¶ 16; 56–58. This Court has jurisdiction over Takings Clause actions in which the government agency has indicated it will not provide compensation, or when a remedy is "so inadequate that the plaintiff would not be justly compensated." *Transohio Sav. Bank,* 967 F.2d at 613 (internal quotation omitted). *See Detroit Int'l Bridge Co.,* 133 F. Supp. 3d at 97. Antitrust suggests that ASCAP and BMI might seek to charge higher license fees to account for the added difficulties Antitrust created. Determination at 21. This indicates that Antitrust expects songwriters to pursue other avenues of remuneration. But pursuing higher licensing fees is impossible without either consent of the services seeking to license the works (who have no reason to agree to such fees given the operation of the consent decrees) or permission of the rate courts (which entails at least two expensive and lengthy litigations). Such suggestions are self-evidently illusory. Moreover, Antitrust fails to address, and could not possibly compensate songwriters for, the incalculable losses they will suffer as a result of having to renegotiate contracts, assume additional costs associated with changes to those contracts, and agree to terms contrary to their expressed desires for their creative work and careers.

## II.   The complaint states constitutional and APA claims.

### A.   Legal Standards for Rule 12(b)(6)

Rule 12(b)(6) motions examine whether the complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). As with a Rule 12(b)(1) motion, when evaluating a motion to dismiss under Rule 12(b)(6) courts must "treat the complaint's factual allegations as true … and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. U.S.*, 617 F.2d 605, 608 (D.C. Cir. 1979)) (citations omitted); *see also Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (under Rule 12(b)(6), courts must

interpret complaint liberally in plaintiff's favor and should grant plaintiff benefit of all inferences that can be derived from facts alleged).

On a Rule 12(b)(6) motion, courts may consider "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997). This provides no mechanism for examining what is asserted or for determining whether a plaintiff has any evidence to support the complaint. *Dioguardi v. Durning*, 139 F.2d 774, 775 (2d Cir. 1944). In other words, a Rule 12(b)(6) motion tests not whether a plaintiff will eventually succeed on the merits, but whether the plaintiff has sufficiently stated a claim for which he or she is entitled to relief. *Woodruff v. DiMario*, 197 F.R.D. 191, 193 (D.D.C. 2000). Courts "must accept the complaint's allegations as true and draw all reasonable inferences in favor of the non-moving party." *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 164 (D.C. Cir. 2015). Defendants' motion to dismiss should be denied if the factual allegations of the complaint, and the reasonable inferences derived from them, support a legal theory entitling plaintiffs to any form of relief. *See id.* Because the allegations in the complaint amply support the claims, the Court should deny the present motion.

## B. Constitutional Violations

### 1. The complaint states a procedural-due-process claim because insufficient procedures concerning the agency action deprived plaintiffs of property and liberty.

It is a violation of procedural due process when the government "impose[s]" a "grievous loss … without the opportunity for notice and an adequate hearing." *Vitek v. Jones*, 445 U.S. 480, 488 (1980). This standard has also been characterized "as a deprivation of life, liberty, or property, without due process of law." *English v. D.C.*, 815 F. Supp. 2d 254, 261 (D.D.C. 2011), *aff'd*, 717 F.3d 968 (D.C. Cir. 2013). Courts "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation

were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

### a.  Defendants deprived plaintiffs of property and liberty interests.

Plaintiffs allege grievous losses and deprivation of several property and liberty rights. To constitute a deprivation, all value in a property does not have to be lost. *See Kaiser Aetna v. U.S.*, 444 U.S. 164, 176 (1979). For example, an easement deprives a landowner of the "right to exclude" even though it affects only one piece of his or her land. *Id.* Similarly, it is well settled that copyright law grants an owner the right to subdivide his or her interest in one or more of the exclusive rights enumerated in 17 U.S.C. § 106. *See Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002–03 (9th Cir. 2015) ("[T]he Copyright Act permits the copyright owner to subdivide his or her interest in what otherwise would be a wholly owned 'exclusive right' by authorizing the owner to transfer his or her share, 'in whole or in part,' to someone else.").

Here, Antitrust is depriving copyright owners of their right to authorize public performances of works in the manner they desire. Moreover, as discussed above, plaintiffs suffer injuries that render some contracts worthless or prevent them from creating new contracts. Compl. ¶¶ 16, 56–58; Section I.B.1.a, *supra*. They have been denied the right to freely license their copyrights and to create joint works with collaborators of their choosing. Compl. ¶ 16, 57–58. The songwriters have thus alleged numerous infringed property and liberty interests justifying the claim, including deprivation of property rights in their copyrights, deprivation of property rights in their contracts, and deprivation of their constitutional rights to freedom of speech and association. Section I.B.1.a, *supra*.

Among the exclusive rights granted to copyright owners are the rights of public performance and the right to license performances of one's copyrighted works. 17 U.S.C. § 106. This right is fundamental to copyright, and is central to achieving the constitutional goals behind the Copyright Clause. *See Mazer,* 347 U.S. at 219; James Madison, *The Federalist No. 43* at 272 (Clinton Rossiter ed., 1961) ("[r]ewarding authors" and "promot[ing] … Progress … [are]

complementary.”); Background, Section 6, *supra*. But Antitrust has deprived songwriters of the ability to freely license their copyrights, which they admit. Determination at 19.

Defendants incorrectly cite *Gen. Elec. Co. v. Jackson* to support their erroneous statement of the law that deprivations require a total loss of property value. Defs. Mem. 14. In fact, this highly restrictive standard applies only to alleged “reputational harm[s].” 610 F.3d 110, 117 (D.C. Cir. 2010). Plaintiffs do not allege reputational harm; they allege a “grievous loss” of liberty or property, which is all that is required to plead a procedural-due-process claim. *See Vitek*, 445 U.S. at 488; Compl. ¶¶ 16, 56–58. Furthermore, as *Jackson* instructs, “costs of compliance”—and in this case also the added harm from noncompliance—are “protected property interests” and a sufficient “deprivation” to trigger the requirements of providing plaintiffs procedural due process. *Jackson*, 610 F.3d at 117.

Defendants’ misstatement of the law is particularly wrongheaded in this District, which has held that imposing “conditions” alone—which do not destroy all value in property—suffices to “deprive the plaintiff” of his or her rights, like “freedom of … association.” *Goings v. Court Servs. & Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 75 (D.D.C. 2011). Plaintiffs here clearly allege a significant cost to comply with the conditions dictated in the Determination. Compl. ¶ 57. Defendants also cite no cases holding that there is a magic-word requirement for “deprivation” to be pleaded, as they imply. Defs. Mem. 14. Plaintiffs have therefore adequately pleaded that they have been deprived of property and liberty.

### b. Defendants deprived plaintiffs of their rights without due process of law.

Defendants do not argue that they provided plaintiffs due process before depriving them of their rights, which is sensible because the procedures employed by the Justice Department were not “constitutionally sufficient.” *See Thompson*, 490 U.S. at 460. The Supreme Court established, as a cornerstone of due-process jurisprudence in *Londoner v. City and County of Denver*, that a government act that targets a known population requires an individualized review of the facts and a hearing. 210 U.S. 373, 385–86 (1908). Songwriters are “a relatively small

number of persons [] concerned, who were exceptionally affected, in each case upon individual grounds" and it should be "held that they had a right to a hearing." *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445–46 (1915). The *Bi-Metallic* test is not quantitative—whether the law affects one or many—it is practical—whether the government can determine who will be affected and how. *See* Lawrence Tribe, *American Constitutional Law* § 10-7, at 667 (2d ed. 1988). Even if a relatively large, but not indeterminate number of identifiable persons will be individually affected, they are entitled to notice and a hearing. *See Thompson v. Washington,* 497 F.2d 626, 639 (D.C. Cir. 1973). Whenever such an identifiable group of individuals is harmed by an agency action, "some form of hearing is required before an individual is finally deprived of a property interest. The right to be heard before being condemned to suffer grievous loss *of any kind* … is a principle basic to our society." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (emphasis added) (internal citations omitted).

As the complaint makes clear, Antitrust never held a hearing on the propriety of the new 100% Mandate. Compl. ¶¶ 48–50. During the course of the rulemaking process, Antitrust told plaintiffs what it would do and began seeking information on how to implement it. Antitrust sought input only on how to adopt its new rule; it did not seek input from plaintiffs on whether the 100% Mandate should or should not be adopted. Compl. ¶ 46. As BMI reported in June 2016, "DOJ did not take in to [*sic*] account the nearly 13,000 BMI songwriters who strongly voiced their concerns." Mike O'Neill, *Mike O'Neill Responds to the Recent Proposal From the US Department of Justice*, BMI (June 30, 2016) http://www.bmi.com/news/entry/mike_oneill_ responds_to_the_recent_doj_proposal. At trial plaintiffs will prove that report is correct.

Even if the due-process standard for a legislative action were applied, Antitrust's Determination would still fail, because an agency with a closed mind violates plaintiffs' due-process rights. *See Nat'l Res. Def. Council, Inc. v. U.S.E.P.A.*, 859 F.2d 156, 194 (D.C. Cir. 1988). *Cf. Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1165–70 (D.C. Cir.1979), *cert. denied,* 447 U.S. 921 (1980) (court ready to find a due-process violation in rulemaking where agency member has unalterably closed mind on critical issue). Plaintiffs have sufficiently alleged

that Antitrust had a closed mind. *See* Compl. ¶ 46 ("SONA eventually became convinced that their participation in the process would not alter the outcome of the review."). Assuming all allegations in the complaint to be true, and finding all reasonable inferences that flow from such allegations in favor of plaintiffs (the nonmoving parties), the Court should deny defendants motion.

> **2. The complaint states a substantive-due-process claim because the agency action deprives plaintiffs of their speech, association, and contract freedoms.**

The Fifth Amendment's Due Process Clause has "a substantive component, which forbids the government to infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). "Strict scrutiny applies to burdens on fundamental rights." *Hutchins v. D.C.*, 188 F.3d 531, 563 (D.C. Cir. 1999) (Edwards, Chief J., concurring); *Heller v. D.C.*, 670 F.3d 1244, 1284 (D.C. Cir. 2011) ("strict scrutiny in … infringement on freedom of association.").

As established in Section I.B.1.a, *supra*, the 100% Mandate will infringe plaintiffs' right to freedoms of speech and association, which are "fundamental libert[ies]." *See N.Y. Times Co. v. U.S.*, 403 U.S. 713, 719 (1971). The sweeping 100% Mandate is not narrowly tailored to serve a compelling government interest.

The 100% Mandate also harms the "freedom to contract, contrary to the federal Constitution." *See S. Power Co. v. N. Carolina Pub. Serv. Co.*, 263 U.S. 508, 509 (1924).[4]

---

[4] There is some academic speculation over whether a case involving minimum-wage laws undercuts the view that freedom to contract is a fundamental liberty. *See* Michael Pillow, *Liberty over Death: Seeking Due Process Dimensions for Freedom of Contract*, 8 Fla. A & M U.L. Rev. 39, 44–48 (2012). Reviewing the leading Supreme Court case, *W. Coast Hotel Co. v. Parrish*, it is clear that even though the Court held that freedom of contract did not prevent legislatively passed minimum-wage laws, the Court did not overrule that freedom of contract was not a fundamental liberty interest. *See* 300 U.S. 379, 395 (1937). Rather, the Court engaged in a strict scrutiny analysis describing the tremendous state interest in protecting workers. *See id.* The holding rested on the critical importance of the protection of workers for the state, not whether the freedom to contract is a fundamental liberty. *See id.* at 399 ("The exploitation of a class of

Defendants have denied plaintiffs their liberty to contract freely without justification. Plaintiffs will no longer be able to make fractional-licensing deals with co-authors, and current agreements that ASCAP and BMI have with songwriters, publishers, and others are now subject to uncertainty; some agreements have lost most if not all of their value. Compl. ¶¶ 16, 30–35, 56–58. Plaintiffs therefore have lost the bargains they made and are now impermissibly limited from entering into new contracts in violation of their freedom to contract. *See S. Power Co.*, 263 U.S. at 509. The suggestions urged in the Determination that songwriters simply renegotiate contracts is also unrealistic, since most songwriters "can ill-afford to hire lawyers to figure out their rights under this inexplicable ruling." Ed Christman, *"Disappointing": Publishing Industry Expresses Confusion, Concern, Over Sweeping Dept. of Justice Decision*, Billboard, (July 5, 2016), http://www.billboard.com/articles/business/7424128/publishing-industry-ascap-bmi-sony-atv-umpg-confusion-concern-blanket-licenses-100-percent.

The Determination also violates the guarantee of equal protection inherent to due process. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). When the government deprives individuals of benefits available to others exercising a fundamental right, strict scrutiny applies to the government's action. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 99 (1972) (analyzing city's differential treatment of plaintiff's picketing under Equal Protection Clause); *Tele-Communications of Key West, Inc. v. U.S.*, 757 F.2d 1130, 1340 (D.C. Cir. 1985) (allegation of differential treatment in violation of the First Amendment without satisfactory justification raises an equal protection claim). As previously discussed, the Determination impermissibly strips plaintiffs' rights to freedom of speech, freedom of association, and freedom to contract—

---

workers who are in an unequal position with respect to bargaining power and are thus relatively defenseless against the denial of a living wage is not only detrimental to their health and well being, but casts a direct burden for their support upon the community."). The Court acknowledges that the "essential limitation of liberty in general governs freedom of contract" *Id*. at 392. Thus, the Court engaged in a classic substantive-due-process analysis; it did *not* rule that freedom of contract is not a fundamental liberty.

for the arbitrary reason that some plaintiffs have associated themselves with ASCAP, BMI, or other artists who associate with ASCAP or BMI. Compl. ¶ 16, 56–58.

### C. APA Violations

#### 1. The August 2016 Determination is an agency action because it is a rule or the equivalent of a rule.

In a statutory provision that defendants cite incompletely, the APA states—non-exhaustively—that "'agency action' *includes* the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13) (emphasis added). *Cf.* Defs. Mem. 16 (omitting "includes" from quoted portion of § 551(13)). In a provision that defendants ignore, the APA states that a "'rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4); *see also* 5 U.S.C. § 701(a)(2) (for purposes of 5 U.S.C. ch. 7, certain terms—including "rule" and "agency action"—have meanings given in 5 U.S.C. § 551).

Within the meaning of the APA, "'[i]nterpretative rules' and 'policy statements' may be rules." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000). The Court has recognized that "[a]lmost any action taken by an agency is either a rule, an order, an adjudication or 'the equivalent … thereof,' [], which if final, is subject to judicial review." *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 893 (D.D.C. 1996) (internal citation omitted) (quoting 5 U.S.C. § 551(13)). "As our court of appeals has noted, the APA's definition of a rule includes 'nearly every statement an agency may make.'" *Id.* (Quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 846 (D.C. Cir. 2006)) (citing *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir 1980)); *Nat'l Wildlife Fed'n v. Babbitt*, 835 F. Supp. 654, 661 (D.D.C. 1993) (same).

Here, the August 2016 Determination, including the 100% Mandate, fits within the broad definition of agency action: it is a rule or the equivalent of a rule. The Determination is an agency statement that:

- applies to copyright holders who license works in accordance with the ASCAP and BMI consent decrees or collaborate with such copyright holders, and to those who would continue to engage in fractional licensing;

- has future effect both for the Justice Department's enforcement of the consent decrees and insofar as it informs the future conduct of SONA's members and that of the individual plaintiffs; and

- interprets the consent decrees and prescribes and implements the Justice Department's enforcement policy.

Defendants' contention that the Determination does not qualify as agency action under the APA finds no support in the case they cite. Defs. Mem. 16 (citing *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004)). In *Independent Equipment Dealers*, the D.C. Circuit was considering whether it had jurisdiction to review an EPA letter under the Clean Air Act. 372 F.3d at 421 (noting grounds asserted by plaintiff IEDA). In ruling that it lacked jurisdiction, the appeals court held that the challenged EPA letter was not "reviewable agency action" under the second part of the Supreme Court's two-part test for "final agency action" in *Bennett v. Spear* (discussed further below), supporting its holding in part by considering the APA's definition of "agency action." *Id.* at 426–27 & 428. But the appeals court opined that the EPA letter was not a "rule" because it did not "'implement, interpret, or prescribe law or policy.'" *Id.* at 428 (quoting 5 U.S.C. § 551(4)). That is because the EPA letter was only "*restating* EPA's established interpretation" of a regulation, and thus "tread no new ground. It left the world just as it found it." *Id.* (emphasis in original). *See also id.* at 427 ("[T]he EPA Letter merely restated in an abstract setting—for the umteenth time—EPA's longstanding interpretation of the Part 89 certificate of conformity regulations.")

Defendants would have this Court believe that the 100% Mandate in the Determination is like an agency letter in that "'left the world just as it found it.'" Defs. Mem. 16 (quoting *Indep. Equip. Dealers Ass'n*, 372 F.3d at 428). It is hard to fathom an example of more hubristic agency disingenuousness.

As detailed in the complaint and explained above, the Determination has not "left the world just as it found it," but has turned upside down decades-old licensing practices and is affecting and threatening songwriters' livelihoods. The Determination promulgating the 100% Mandate is agency action.

### 2.   The August 2016 Determination is a reviewable final agency action.

An agency action is reviewable if it is "final" and "no other adequate remedy in a court" exists. 5 U.S.C. § 704. Congress has prescribed that persons suffering legal wrong are "entitled to judicial review" of agency action. 5 U.S.C. § 702. And the Supreme Court has explained that the APA embodies a "basic presumption of judicial review to one 'suffering legal wrong because of agency action.'" *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967) (quoting 5 U.S.C. § 702).

### a.   The Determination is final because it concluded the Justice Department's consent-decrees review, determining plaintiffs' rights and obligations and having legal consequences.

The Supreme Court's 1997 decision in in *Bennett v. Spear* sets forth a two-part test for finality that the Court reiterated last year: "'First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1813 (2016) ("*Hawkes*") (quoting *Bennett*, 520 U.S. at 177–78).

In addition, the Court has long taken a "pragmatic" approach to finality. *Hawkes*, 136 S. Ct. at 1815. *See Abbott Laboratories*, 387 U.S. at 149, 150 (explaining that the Court has "interpreted the 'finality' element in a pragmatic way" and "taken a … flexible view of finality.").

Defendants effectively concede that that the August 2016 Determination satisfies the first condition of finality; they make no contrary argument, and the Determination states that "[t]he [Antitrust] Division has now concluded its investigation." Determination at 3. And the title of the

document itself indicates that it is issued "on the closing" of the review of the consent decrees. *Id.* at 1. The Determination also satisfies the second condition of finality because it determines rights and obligations, and legal consequences flow from the Determination.

In particular, the Determination sets forth a history of its enforcement efforts and then announces future enforcement: While Antitrust "will forbear for one year from any enforcement action based on any purported fractional licensing," Antitrust instructs that "it is essential" for the industry to "move towards a shared understanding that ASCAP and BMI offer full-work licenses." Determination at 17 (heading for § VI) (bold omitted); *id.* at 17. Then Antitrust essentially guarantees enforcement action if necessary steps are not taken, declaring that songwriters are obligated to "renegotiat[e] [] contractual agreements between co-owners to allow ASCAP or BMI to provide a full-work license to the song." Determination at 4. And Antitrust states in the Determination that it "is cognizant that any move to this common understanding will require adjustment by some market participants," and that Antitrust "expects that ASCAP and BMI will take the steps necessary … including obtaining from songwriter and publisher members the assurances they need and, to the extent necessary, removing works from their licenses." Determination at 17, 18. That expectation regarding the "songwriter … members" of ASCAP and BMI directly implicates plaintiffs—Songwriters of North America and three individual songwriters, who are members of those PROs or co-writers with others who are.

Indeed, the enforcement promised after one year has elapsed could come before then. Antitrust says it "will not take any enforcement action based on any purported fractional licensing by ASCAP and BMI for one year," but warns that is only "as long as ASCAP and BMI proceed in good faith to ensure compliance" with the consent decrees as Antitrust now interprets them. *Id.* at 17–18. For the PROs to show good faith, Antitrust "expects that ASCAP and BMI will take the steps necessary to eliminate such uncertainty" about the PROs' ability to license specific works by "obtaining from songwriter and publisher members the assurances they need and, to the extent necessary, removing works from their licenses if they cannot be offered on a full-work basis." *Id.* at 18. Viewed pragmatically, for plaintiffs the Determination has "'direct

and appreciable legal consequences.'" *Hawkes,* 136 S. Ct. at 1814 (quoting *Bennett*, 520 U.S. at 178).

The Determination has the same attributes as agency actions that the Supreme Court has held reviewable. In *Hawkes*, the Court found reviewable a Corps of Engineers jurisdictional determination that was "binding on the Government and represent[ed] the Government's position in any subsequent Federal action or litigation concerning that final determination." 136 U.S. at 1814 (internal quotation marks omitted). A negative judicial determination "narrows the field of potential plaintiffs and limits the potential liability a landowner faces for discharging without a permit," and those effects are legal consequences satisfying the second prong in *Bennett*. *Id.* Here, the Determination's conclusion that the consent decrees require full-work licensing is binding on the government and, as Defendants concede, represents the government's position. *See* Defs. Mem. 19–20. ASCAP's and BMI's compliance with the 100% Mandate would narrow a field of potential defendants and limit the PROs' liability.

These effects of the 100% Mandate are therefore legal consequences for every songwriter affiliated with either ASCAP or BMI who has co-written songs with another who is not a member of the same PRO—including many of plaintiff SONA's members, such as plaintiff Michelle Lewis—and for every songwriter who is not affiliated with ASCAP or BMI but has co-written songs with another who is, including plaintiffs Thomas Kelly and Pamela Sheyne. Compl. ¶¶ 20–22.

The Determination also has characteristics that the Supreme Court found reviewable in *Frozen Food Express v. U.S.*, 351 U.S. 40, 44 (1956). As the Court summarized in *Hawkes*, the agency action at issue in *Frozen Food* was an order specifying which commodities the ICC believed were exempt by statute from regulation. *Hawkes*, 136 S. Ct. at 1815. Although the ICC's order had no authority except to give notice of how the agency interpreted the relevant statute, and would have effect only if and when a particular action was brought, the Court held that the order was immediately reviewable. *Id.* (citing *Abbott Laboratories*, 387 U.S. at 150, and *Frozen Food*, 351 U.S. at 44–45). The order in *Frozen Food* "warns every carrier, who does not

have authority from the [ICC] to transport those commodities, that it does so at the risk of incurring criminal penalties." 351 U.S. at 44. Similarly, the agency action in *Hawkes* was reviewable because it "deprives respondents of a five-year safe harbor from liability" and "warns that if they discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties." 136 S. Ct. at 1815.

Here, the 100% Mandate deprives the PROs and plaintiffs of the assurance that fractional licensing is permitted under the consent decrees and warns that, if they continue to use fractional licensing, they do so at the risk of a Justice Department enforcement action. Thus, the 100% Mandate "has an immediate and practical impact" on songwriters, publishers, and the PROs; it "is not therefore abstract, theoretical, or academic." *Frozen Food*, 351 U.S. at 44. The 100% Mandate becomes "the basis" for stakeholders in the consent decrees "in ordering and arranging their affairs." *Id.* Stakeholders "are told that they are or are not free to" continue the widespread practice of fractional licensing, and this "touches vital interests" of the stakeholders. *Id.* These "consequences … are not conjectural." *Id.*

Defendants contend that the Determination "does not determine any rights or obligations, and no legal consequences flow from it," Defs. Mem. 17, but the cases they rely on do not support that contention. *Id.* at 17–18. For example, in *AT&T Co. v. EEOC*, the D.C. Circuit was considering a letter of determination sent to each of two AT&T employees, stating the EEOC's view that the company had discriminated against them for refusing to give them full credit for time they had missed during pregnancy. 270 F.3d 973, 974 (D.C. Cir. 2001). AT&T later received two letters informing the company that the EEOC would refer the matter to its legal department if conciliation failed, and then received notice of EEOC's conclusion that conciliation indeed had failed. *Id.* at 974–75.

The D.C. Circuit affirmed the district court's holding that the Letters of Determination were unreviewable, but AT&T had acknowledged that that each Letter was not final agency action; instead AT&T argued that the EEOC's entire course of conduct showed the agency had reached a final conclusion on its legal position. *Id.* at 975. Moreover, the appeals court explained

that even with all that agency conduct the EEOC had not yet decided "how it plans to act upon [its] view." *Id.* And the appeals court recognized that there are "circumstances in which an agency's taking a legal position itself inflicts injury or forces a party to change its behavior, such that taking that position may be deemed final agency action." *Id.* at 976 (citing *Appalachian Power*, 208 F.3d at 1022 (holding "a Guidance" issued by EPA is final because it represents settled position that agency "plans to follow.").

In contrast with the case relied on by defendants, as described in Section I.B, *supra*, even before litigation defendants are not merely taking a legal position but directing songwriters to take actions or face enforcement risks in a manner that inflicts injury and forces songwriters and others to change their behavior. Defendants also make clear in the Determination "how it plans to act" in enforcing the 100% Mandate after August 4, 2017—or sooner if the Justice Department perceives insufficient good faith. Determination at 17–18. It is beyond reasonable dispute that the Justice Department "plans to follow" its legal position, and threatening enforcement constitutes final agency action. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436–39, 438 n.9 (D.C. Cir. 1986) (holding letter from agency official stating agency's position and threatening enforcement action unless company complied constituted final agency action); *see also Ctr. for Auto Safety.*, 452 F.3d at 807 (D.C. Cir. 2006) (explaining that if guideline is binding on its face or in practice, it may be reviewable rule even when agency merely threatens enforcement); *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 50 (D.C. Cir. 2000) ("Legal consequences flow from the position expressed" where plaintiff "must keep records and report to EPA unless it wishes to risk an enforcement action.").

In addition, the D.C. Circuit in *AT&T* "assume[d], without deciding, that the finality requirement would be satisfied if the [EEOC] decided to enforce the Act against an employer but then delayed the filing of a complaint." 270 F.3d at 976. Plaintiffs' factual allegations here, which include defendants' threats to enforce the Determination, warrant denying the present motion to dismiss. *See, e.g.*, Compl. ¶ 12.

*Center for Auto Safety* also does not help defendants. That case held policy guidelines from the National Highway Traffic Safety Administration unreviewable, but the agency action there "does not involve a challenge to threats of enforcement." 452 F.3d at 807. *See also id.* at 809 ("NHTSA has not commanded, required, ordered, or dictated …. [N]othing … indicate[s] that officials in NHTSA's Office of Defects Investigation are bound to apply the guidelines in an enforcement action. The agency remains free to exercise discretion in assessing proposed recalls and in enforcing the Act.") The Determination here leaves no discretion to the Justice Department: fractional licenses are determined to be impermissible under the consent decrees, and the Department will enforce the 100% Mandate if fractional licensing continues.

Defendants also rely on *NAACP v. Meese*, but the circumstances present there were very different from those existing here. 615 F. Supp. 200 (D.D.C. 1985). There, the Justice Department made known, apparently in letters to affected municipalities, that it considered consent decrees in some 51 cases were contrary to a 1984 Supreme Court employment-discrimination decision. *Id.* at 201, 202 n.5 & 203 n.7. Plaintiffs including the NAACP sought to enjoin the Attorney General from "reopening, causing to be reopened, or consenting to the reopening of any decree in an action brought by the government under Title VII of the Civil Rights Act of 1964." *Id.* at 201. Consequently, "[w]hat plaintiffs are asking this Court in essence to do is to direct the formulation and presentation by the Department of Justice of its legal position in a number of lawsuits, whether now pending in federal courts or to be filed in such courts in the future." *Id.* at 202 (footnote omitted). But in this case defendants' legal position is already formulated: the Justice Department will enforce the 100% Mandate after August 4, 2017. Moreover, while the Justice Department's letters "urg[ed] affected municipalities to seek to modify consent decrees," the letters could not directly affect legal rights because "the governing bodies of these municipalities remain free to oppose the Justice Department's approach—as many of them apparently have done." *Id.* at 203 n.7. But defendants' position here is that the related ASCAP and BMI consent decrees have always required full-work licenses, so neither decree must be reopened. Determination at 3, 11–13. And, of course, nothing in *NAACP v. Meese*

indicates that the letters to municipalities contained anything like the industry-upending demands that defendants make in the August 2016 Determination.

### b.   No adequate alternative remedy is available from the Southern District of New York.

The APA makes reviewable agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Defendants contend that judicial review is unavailable here because plaintiffs would have an adequate remedy by intervening in the *ASCAP* and *BMI* cases. Defs. Mem. 18. But the Supreme Court has explained that "adequate remedy" refers only to situations "where the Congress has provided special and adequate review procedures"—for example, where "statutes creating administrative agencies defined the specific procedures to be followed in reviewing a particular agency's action." *Bowen v. Massachusetts*, 487 U.S. 879, 903, (1988) (internal quotations omitted).

The Court has also "long held" that "parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of 'serious criminal and civil penalties.'" *Hawkes*, 136 S. Ct. at 1815 (quoting *Abbott Laboratories*, 387 U.S. at 153). Plaintiffs here "need not assume such risks while waiting for" the Justice Department "to 'drop the hammer' in order to have their day in court." *Id.* (quoting *Sackett v. EPA*, 132 S. Ct. 1367, 1372 (2012)). And the Court has admonished that the "adequate remedy" provision "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen*, 487 U.S. at 903. *See Scenic Am., Inc. v. U.S. Dep't of Transportation*, 983 F. Supp. 2d 170, 184–85 (D.D.C. 2013) (denying motion to dismiss concerning agency action interpreting law, and rejecting argument that state courts' availability to challenge multiple states' decisions to permit digital billboards was "adequate remedy" under § 704).

Defendants contend that plaintiff could intervene in the ASCAP and BMI rate-court actions under Federal Rule of Civil Procedure 24(b)(1). Defs. Mem. 18–19. But defendants do not identify and plaintiffs are unaware of any applicable "conditional right to intervene [given] by a federal statute." Fed R. Civ. P. 24(b)(1)(A). Nor do defendants identify any "claim or

defense that shares with the main action a common question of law or fact." Fed R. Civ. P. 24(b)(1)(B). As described in Section I.C, *supra*, the constitutional and APA claims in the complaint here are very different from the antitrust issues addressed by the ASCAP and BMI consent decrees.

Thus, no other adequate remedy in court exists. Plaintiffs SONA, Michelle Lewis, Thomas Kelley, and Pamela Sheyne therefore look to this Court to protect their interests. The Court should deny the motion to dismiss.

### III.   In the alternative, plaintiffs should be granted leave to amend the complaint.

As demonstrated throughout this opposition, the complaint gives defendants fair notice of plaintiffs' claims and the grounds upon which they rest. If for any reason, however, this Court detects any pleading deficiencies, plaintiffs should be granted leave to amend.

"Congress intended to permit amendment broadly to avoid dismissal of suits on technical grounds." *Swan v. Clinton,* 100 F.3d 973, 980 (D.C. Cir.1996). Such leave is freely and liberally granted as a matter of judicial policy. *See* Fed. R. Civ. P. 15(a)(2); *Monroe v. Williams*, 705 F. Supp. 621, 623 (D.D.C. 1988). ("[A] district court should grant a motion to amend unless there is a clear and solid justification for denying it."). Defendants here allege no "apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 344 (D.C. Cir. 1997). "[I]n the absence of [such reasons] … the leave sought should, as the rules require, be freely given." *Id.* In fact, judicial authority and policy weighs so heavily in favor of freely and liberally granting leave to amend that the Ninth Circuit has held that inferences should be drawn by the court from a plaintiff's pleading in favor of granting leave to amend a pleading. *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) (reversing denial of leave to amend, holding that even though plaintiff's previous amended complaints might have been filed in bad faith, since there was no

40

record evidence that subsequent amended complaint would have been filed in bad faith, amendment should have been permitted).

This request in the alternative is the first request for leave to amend the complaint and the first challenge defendants have made to the claims at issue. As such, plaintiffs have yet to benefit from any guidance from the Court about the merits of these claims. Since defendants have not alleged bad faith or any other reasons that might preclude amendment, the Court should permit plaintiffs leave to amend their complaint, if necessary.

## IV.   Plaintiffs request oral argument.

In accordance with Local Civil Rule 7.1(f), plaintiffs request oral argument on defendants' motion to dismiss.

## CONCLUSION

Defendants' motion to dismiss should be denied.


Dated: February 7, 2017                    Respectfully submitted,

                                           /s/ Gerard P. Fox
                                           Gerard P. Fox (D.C. Bar No. 401744)
                                           GERARD FOX LAW, P.C.
                                           3050 K Street, NW, Suite 210
                                           Washington, DC 20007
                                           202-779-9953
                                           gfox@gerardfoxlaw.com

                                           Steven I. Wallach (D.D.C. Bar No. NY0228)
                                           GERARD FOX LAW, P.C.
                                           12 E. 49th Street, Suite 2605
                                           New York, NY 10017
                                           212-690-4980
                                           swallach@gerardfoxlaw.com

                                           *Attorneys for Plaintiffs*